# UNITED STATES DISTRICT COURT **FILED**

## EASTERN DISTRICT OF CALIFORNIA

_____ooo_____

JUN 0 4 2007

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

**DEPUTY CLERK**

UNITED STATES OF AMERICA **SEALED**

v.

HARRISON ULRICH JACK;
GENERAL VANG PAO,
    aka Pao Vang,
    aka Vang Pao;
LO CHA THAO;
LO THAO;
    aka President Lo Thao
    aka Xia Lo Thao;
YOUA TRUE VANG,
    aka Joseph Youa Vang,
    aka Colonel Youa True Vang;
HUE VANG;
CHONG YANG THAO;
SENG VUE; and
CHUE LO,

              Defendants.

**CRIMINAL COMPLAINT**

CASE NUMBER:

**2 0 7 - MJ - 0 1 7 8**   GGH

**REDACTED**
ONLY VERSION TO BE FILED
AND DISTRIBUTED PUBLICLY
PER COURT ORDER

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about **the dates set forth in the attached charge sheet in Sacramento, Yolo, Fresno,** Counties, in the Eastern District of California and elsewhere, defendants did, (Track Statutory Language of Offense)

▶ **See attached charge sheet**

in violation of Title **18,** United States Code, Section(s) **371, 956(a), 956(b), 960, 2332g,** and other code section provided in the attached charge sheet. I further state that I am a Special Agent, Bureau of Alcohol, Tobacco, Firearms and Explosives and that this complaint is based on the following facts:

▶ **See attached affidavit**

**X** Continued on the attached sheet and made a part hereof.

**REDACTED**

Signature of Complainant

        S/A, ATF

Sworn to before me, and subscribed in my presence

June 3, 2007          at    Placerville, CA

Date

HONORABLE GREGORY G. HOLLOWS

United States Magistrate Judge

Name and Title of Judicial Officer

City and State

Signature of Judicial Officer

## Complaint Charge Sheet
## United States v. Harrison Jack, et al.

Count One: [18 U.S.C. § 371 - Conspiracy to Violate the Neutrality Act, 18 U.S.C. § 960]

### I. PARTIES, PERSONS AND ENTITIES

1. At all relevant times:

Defendant HARRISON ULRICH JACK has been a resident of Woodland, Yolo County, in the Eastern District of California. Defendant JACK operates a consulting business located at 101 Monte Vista Drive, Woodland, California.

Defendant JACK is a graduate of the United States Military Academy at West Point, Class of 1968, and was commissioned upon graduation into the Infantry Branch of the Army. He is a graduate of the Infantry Officer's Basic Course, Airborne School and Ranger School, as well as other Army professional training. JACK served at least one tour as an Army officer in Southeast Asia before being released from active duty in the Army in 1977. He is a retired military officer of the United States, having retired from the California National Guard with the rank of Lieutenant Colonel.

2. Defendant VANG PAO is a former General in the Royal Army of Laos, and came to the United States in or about 1975. Defendant VANG Pao is the head of an organization known as the Neo Hom, and has lobbied on behalf of Hmong causes in the United States and in Laos. At all relevant time, defendant VANG Pao has

1

been a resident of Westminster, in Orange County, California.

3. Defendant LO CHA THAO has been a resident of Clovis, in Fresno County, California. Lo Cha THAO formerly worked as an aide to a former Wisconsin state senator.

4. Defendant LO THAO, aka President Lo Thao, aka Xai Lo Thao has been a resident of Sacramento County, California. Defendant Lo THAO is the president of United Hmong International (UHI), which is also known as the Supreme Council of the Hmong 18 Clans. He is the Thao clan representative on UHI.

5. Defendant YOUA TRUE VANG, aka Joseph Youa Vang, aka Colonel Youa True Vang is a resident of Fresno, California, and is a founder of Hmong International New Year in Fresno.

6. Defendant HUE VANG is a former Clovis, California police officer. He is the Director of United Lao Council for Peace, Freedom and Reconstruction.

7. Defendant CHONG YANG THAO is a resident of Fresno, California and is associated with a chiropractic clinic.

8. Defendants SENG VUE, who is a resident of Fresno, and CHUE LO, who is a resident of Stockton, are clan representatives in United Hmong International.

## II. PRELIMINARY ALLEGATIONS

9. Laos, also known as the Lao People's Democratic Republic ("Laos") is a sovereign nation with which the United States has been at peace at all times relevant to this Complaint. The

2

capital city of Laos is Vientiane.

10. A machine gun is one which will fire more than one round, or bullet, without manual reloading, with a single function of the trigger. It is a violation of federal law in the United States to possess, transfer or receive automatic weapons unless authorized by law, such as members of the military who are assigned these weapons as part of their military mission, or unless registered with the National Firearms Registry maintained by the Bureau of Alcohol, Tobacco, Firearms and Explosives.

11. An AK-47 is a machine gun, which are manufactured in former Soviet Bloc countries, including Russia, other former Soviet Republics and Poland. It is an automatic weapon within the meaning of 18 U.S.C. §922(o) and 26 U.S.C. §§ 5845(b) & 5861.

12. An M-16 is a machine gun which is manufactured in the United States for use by United States military departments. It is an automatic weapon within the meaning of 18 U.S.C. § 922(o) and 26 U.S.C. §§ 5845(b) & 5861.

13. Grenades, rocket-propelled grenades, Claymore mines, C-4 explosives, LAW rockets, and AT-4 anti-tank rockets all are explosive devices within the meaning of Title 18 and Title 26 of the United States Code. It is a violation of federal law in the United States to possess, transfer or receive these destructive devices unless authorized by law, such as members of the military who are assigned these weapons as part of their military mission, or unless registered with the National Firearms Registry main-

3

tained by the Bureau of Alcohol, Tobacco, Firearms and
Explosives.

14.  Stinger missiles are surface-to-air missiles that are
designed to destroy aircraft.

### THE CONSPIRACY

15.  Beginning on a date unknown, but no later than in or
about November 2006, and continuing until on or about June 3,
2007, in the Eastern District of California and elsewhere,
defendants:

                    HARRISON ULRICH JACK;
                    GENERAL VANG PAO,
                         aka Pao Vang,
                         aka Vang Pao;
                    LO CHA THAO;
                    LO THAO;
                         aka President Lo Thao,
                         aka Xai Lo Thao;
                    YOUA TRUE VANG;
                         aka Joseph Youa Vang,
                         aka Colonel Youa True Vang;
                    HUE VANG;
                    CHONG YANG THAO;
                    SENG VUE; and
                    CHUE LO,

did conspire, combine, confederate and agree with each other and
others both known and unknown to the grand jury, to commit
offenses against the United States as follows:

(a) to violate the Neutrality Act, in violation of Title 18,
United States Code, Section 960, by providing and preparing a
means for and furnishing the money for and taking part in a
military expedition or enterprise to be carried on against the

4

territory and dominion of the foreign and sovereign nation of
Laos, with which the United States is at peace.

### THE OBJECT OF THE CONSPIRACY

16. The object of the conspiracy was to engage in the
violent overthrow of the sovereign government of the nation of
Laos, by engaging in an armed insurgency operation in Laos as
prohibited by 18 U.S.C. § 960.

### MANNER AND MEANS BY WHICH THE
### CONSPIRACY WAS CARRIED OUT

The manner and means by which the conspiracy was sought to
be accomplished included, among others, the following:

17. Defendants General VANG Pao, Lo Cha THAO, Lo THAO, Youa
True VANG, Hue VANG, Seng VUE, Chue LO and others formed a
committee to evaluate the feasibility of conducting a military
expedition or enterprise to engage in the overthrow of the
existing government of Laos by violent means, including murder,
assaults on both military and civilian officials of Laos and
destruction of buildings and property of Laos.

18. The committee utilized the well established Hmong
tribal clan structure as part of the conspiracy. The committee
operated within the general scope of a Lao liberation movement
known as Neo Hom, also known as the United Lao National
Liberation Front. The acknowledged leader of the Neo Hom
movement in the United States is General VANG Pao.

19. The members of the committee, operating through or in

5

conjunction with the Neo Hom movement, assigned rank and responsibilities to members of the committee and the Neo Hom movement.

20. The members of the committee engaged in extensive fund-raising activities for the purpose of acquiring substantial financial assets which could be used to purchase military arms, materiel, and munitions, such as AK-47 and M-16 automatic rifles, Stinger missiles, LAW rockets, AT-4 anti-tank rockets, Claymore mines, C-4 explosives, night vision goggles, magazines and ammunition for all the weapons, medical kits and rain gear, and related military equipment.

21. According to the defendants, the committee recruited intelligence assets to conduct surveillance and reconnaissance operations throughout Laos, including the national capital area in Vientiane, Laos.

22. According to the defendants, the committee recruited and organized a military force of insurgent troops within Laos, organized into military departments based upon provincial boundaries.

23. The committee engaged in procurement operations to acquire military arms, equipment, materiel, and munitions for use in military operations in Laos. As part of the procurement process, the committee recruited and utilized defendant Harrison JACK, a former career United States Army infantry officer who has

6

contacts in the American defense, homeland security and defense contractor community.

24. As part of the attempt to acquire military arms and munitions, defendant JACK and other members of the committee have contacted members of the defense contractor community from whom the committee believed it could purchase firearms, destructive devices and other military arms and munitions.

25. As part of the attempt to engage in the violent overthrow of the government of Laos, the committee and its members created an operational plan for armed insurgency operations in Laos and located insurgent troops at various locations in Laos in preparation of initiating hostile actions against the government of Laos.

26. During the period since January 2007, the defendants collectively and individually personally inspected samples of military arms and munitions for purchase and delivery to Thailand and Laos. The weapons which the named defendants personally inspected include: AK-47 machine guns; M-16A1 and M-16A2 machine guns, including some with grenade launchers; RPG-7 rocket-propelled grenade launchers; LAW rockets; AT-4 anti-tank rockets; Claymore mines; C-4 explosives; Stinger missiles; and the ammunition for the AK-47s.

27. As part of the insurgency operation, the defendants attempted to secure the temporary services of a number of

7

mercenary operatives with training and experience as special operations troops, such as former U.S. Army Special Forces soldiers or U.S. Navy SEALs, who have left military service and now are private citizens.

28. As recently as mid-May 2007, the committee had intelligence operatives in place in Vientiane, Laos conducting surveillance of military and government facilities in downtown Vientiane, and forwarding that intelligence information to members of the committee, including defendant Lo Cha THAO.

29. As part of the insurgency operation, the defendants issued an operations plan to a contractor to conduct a military strike in downtown Vientiane, Laos against specifically identified military and civilian government personnel and buildings. The defendants have issued instructions that the mercenary force is to destroy these government facilities, to reduce them to rubble, and make them look like the results of the attack upon the World Trade Center in New York on September 11, 2001.

30. As part of the insurgency operation, the defendants provided a contractor with maps of Laos showing the emplacements of both insurgent and Lao government troops, as well as staging areas and landing zones into which personnel and equipment could be inserted for combat operations. The defendants have identified on maps and photographs certain government buildings and facilities which they wish to have destroyed in the opening

8

hours of insurgent military operations against the government of Laos.

31.  As part of the insurgency operation, the defendants discussed the purchase of thousands of items of military arms, ammunition, and munitions.  The defendants have purchased an initial installment of 125 AK-47 machine guns, 20,000 rounds of ammunition, and crates of smoke grenades for a purchase price of $100,000, to be delivered in Bangkok, Thailand on June 12, 2007. The defendants have identified a safe house in Thailand near the Lao border for the seller of the arms to make the delivery.

32.  As part of the insurgency operation, the defendants have made arrangements for a second installment of military arms to be delivered to a remote location in Thailand on June 19, 2007.  The second delivery of military arms includes a number of Stinger missiles, whose purpose is to destroy aircraft while in flight.

33. As part of the insurgency operation, defendant Lo Cha THAO and other defendants have made arrangements to deliver personally $50,000 to the seller in United States currency in Bangkok, Thailand on June 11, 2007.  The $50,000 payment is one half of the purchase price for the first installment of arms. The defendants have arranged to pay the remaining $50,000 of the purchase price the following day, June 12, upon receipt of the weapons at a GPS marked location in Thailand, near the border

9

with Laos. The defendants also have arranged to pay a third installment of $50,000 on June 12 as the first half of the payment for the June 19 delivery, which includes a number of Stinger missiles.

34. As part of the insurgency operation, the defendants have dispatched a number of money couriers from the United States to Thailand, each with approximately $10,000 in United States currency, in order to transfer to Bangkok the $150,000 that they intend to pay on June 11th and 12 for the first two installments of the arms and munitions which they have purchased.

## OVERT ACTS

35. In furtherance of that agreement and to effect the objects thereof, one or more of the defendants or their co-conspirators performed the following overt acts in the Eastern District of California and elsewhere:

A. In or about November 2006, in the Eastern District of California, defendant Harrison U. JACK engaged in a telephone conversation with a third party regarding the purchase of 500 AK-47 machine guns.

B. On or about January 23, 2007, in the Eastern District of California, defendant Harrison U. JACK engaged in a telephone conversation with an undercover agent from the United States Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) regarding the purchase of 500 AK-47 automatic rifles to be

10

delivered in Bangkok, Thailand.

C. On or about January 25, 2007, in the Eastern District of California, defendant Harrison U. JACK met with an ATF undercover agent and engaged in a conversation regarding the purchase of 500 automatic rifles (either AK-47 or M-16), 3,000 magazines and over 90,000 rounds of ammunition, along with the services of an unspecified number of mercenary special operations troops.

D. On or about February 1, 2007, in the Eastern District of California, defendant Harrison U. JACK engaged in a telephone call with the ATF undercover agent, at which time JACK advised the agent that he had a meeting the following day at which he would pass on to the group that the agent was able to air-drop arms into Laos to specific landing zones, and also was able to provide 24 mercenary special operations troops for operations in Laos.

E. On or about February 5, 2007, in the Eastern District of California, defendant Harrison U. JACK left a telephone message with the undercover agent in which JACK advised the agent that Wednesday would be an ideal time to meet. JACK advised the agent that the highest leadership, including General VANG Pao would be present.

F. On or about February 5, 2007, in the Eastern District of California, defendant Harrison U. JACK engaged in a telephone conversation with the undercover ATF agent, at which time JACK

11

advised the agent that he was on the other line with General VANG
Pao as they spoke, and that JACK was going to bring four or five
people to the meeting on Wednesday.  JACK advised the agent that
General VANG Pao was "your number one person. Okay?"

## The February 7, 2007 meeting

G.  On or about February 7, 2007, in the Eastern District
of California, defendants Harrison U. JACK, General VANG Pao, Lo
Cha THAO, Lo THAO, Seng VUE, Chue LO, Youa Vang THAO, Hue VANG,
and four other uncharged associates of General VANG Pao engaged
in a face-to-face meeting with the undercover agent at a
restaurant in Sacramento, California.

H.  On or about February 7, 2007, in the Eastern District of
California, defendants Harrison U. JACK, General VANG Pao, Lo Cha
THAO, Lo THAO, Seng VUE, Chue LO, Youa Vang THAO, Hue VANG, and
other uncharged associates of General VANG Pao engaged in a
conversation with an ATF undercover agent regarding the purchase
of automatic weapons, magazines, ammunition, explosives, LAW
rockets, RPGs, Claymore mines, and other arms and munitions.

I.  On or about February 7, 2007, in the Eastern District of
California, defendants Harrison U. JACK, General VANG Pao, and
others provided an ATF undercover agent with several maps of
Laos, showing locations purported to be Lao government military
positions and insurgent forces positions.

J.  On or about February 7, 2007, in the Eastern District of

12

California, defendants Harrison U. JACK, General VANG Pao, Lo Cha THAO, Lo THAO, Seng VUE, Chue LO, Youa Vang THAO, Hue VANG, and several other uncharged associates of General VANG Pao personally inspected a sample of AK-47 and M-16 machine guns, C-4 explosives, LAW rockets, RPG launchers, Claymore mines, and other arms and munitions. The agent gave them a list of the arms and munitions which he had available for their purchase. The list identified items by letter, and it was agreed that in future communications the members of the committee would refer to the items only by letter identifier, and not by name. The list was loaded onto a computer memory chip and given to the defendants.

### Communications Following the February Meeting

K. On or about February 15, 2007, in the Eastern District of California, defendant Harrison U. JACK contacted the ATF undercover agent to advise that he had just finished a major strategy meeting with approximately 22 senior leadership members. JACK said that they were "in motion" and had budgeted for virtually everything on the weapons inventory/price list which the undercover agent had provided on February 7. The cost of the entire list which had been provided was approximately $9.8 million.

L. On or about March 2, 2007, in the Eastern District of California, defendant Harrison U. JACK contacted the ATF undercover agent and left a message that JACK and Lo Cha THAO and

13

several members of the leadership recently had gone to Wisconsin and Minnesota to generate political support.

M. On or about March 5, 2007, defendant Harrison U. JACK met with the undercover agent for one hour and 45 minutes at a bar and grill in Sacramento. JACK advised the undercover agent that approximately three weeks earlier, he had organized and attended a conference call for all the Hmong leadership in the United States. JACK stated that he had been involved in several conversations with General VANG Pao and his group in which General VANG Pao stated that they wanted to achieve their objective, i.e., overthrow of the government of Laos, immediately.

N. On or about March 5, 2007, in the Eastern District of California, defendant Harrison U. JACK told the undercover agent that the Neo Hom organization had people running operations on a regular basis, and that JACK had been shown an operations plan that had impressed him.

O. On or about March 7, 2007, in the Eastern District of California, defendant JACK advised the undercover agent that all the communist leadership worked and lived in the same location in Vientiane, Laos, and were guarded by disloyal military security.

P. On or about March 7, 2007, in the Eastern District of California, defendant JACK had a discussion with the undercover agent about Stinger missiles and their ability to take down

14

helicopters which were spraying "yellow rain" in Laos. "Yellow rain" is a chemical agent which can kill or injure people who come into contact with it. JACK asked how soon the missiles could be in Laos.

Q.    On or about March 30, 2007, in the Eastern District of California, defendant JACK advised the undercover agent that his associates had begun the money collection process. They had less than $100,000, but expected to have more soon.

R.    On or about March 30, 2007, in the Eastern District of California, defendant Lo Cha THAO spoke to defendant JACK. They discussed meeting so that they could review intelligence obtained from Laos.

S.    On or about April 4, 2007, in the Eastern District of California, defendant Lo Cha THAO called defendant JACK, and explained that he had just returned from a four-day planning meeting. Defendant Lo Cha THAO said that he wanted to meet with defendant JACK and "the guy with the equipment" (referring to the undercover agent). Lo Cha THAO told Jack that General VANG Pao had ordered funding to be in place for a purchase.

T. . On or about April 5, 2007, in the Eastern District of California, defendant JACK called Lo Cha THAO and asked how soon General VANG Pao would want to "round up any of that equipment like we were talking last time." THAO told JACK that a meeting scheduled for the following day would address that issue. THAO

15

said that the budget, which he described as "standing by," consisted of contributions from community leaders through the clan leadership.

U.    On or about April 9, 2007, in the Eastern District of California, defendant Lo Cha THAO spoke to defendant JACK. During the conversation, JACK asked THAO about the size of the weapons order.   THAO said that he had an idea about the order and wanted to discuss the matter on April 13.   THAO said that payment would be in U.S. dollars rather than Thai baht.

## The April 12 & 13ᵗʰ Meetings

V.    On or about April 12, 2007, in the Eastern District of California, defendant JACK met with the undercover agent at a bar and grill in Sacramento.   JACK asked how many M67 fragmentation grenades, M18 Claymore mines and M72A2 LAW rockets were in a case, and whether the price list reflected the price of an individual item or of a case of the items.   JACK also asked the undercover agent if he had detonation cord and blasting caps for the explosives on the list.   JACK told the undercover agent that he would be going to Stockton the following day to meet with the leadership.

W.    On or about April 12, 2007, in the Eastern District of California, defendant LO Cha THAO spoke to JACK, and explained that General VANG Pao would give the order pending the outcome of an intelligence mission inside Laos to determine if an unnamed

16

person, with the proper equipment, could handle "the coup." Lo Cha THAO asked JACK to meet him the following day in the parking lot of the K-mart store near Highway 99 and Farmington Road in Stockton.

X. On or about April 13, 2007, in the Eastern District of California, defendants JACK and Lo Cha THAO met for approximately 25 minutes in the K-mart parking lot in Stockton.

Y. On or about April 13, 2007, in the Eastern District of California, defendant JACK advised the undercover agent that he had learned from Lo Cha THAO how the Hmong guerilla army in Laos is divided.

Z. On or about April 13, 2007, in the Eastern District of California, defendant JACK said the undercover agent should deliver the equipment to a staging area in Thailand, and that the staging area is a residence near the Laos border. He provided the address. JACK explained it is occupied on a continual basis and has satellite communications capabilities. JACK said that his Hmong contacts still wanted to hire mercenaries from the undercover agent. JACK estimated that they had millions of dollars to spend and that an initial order for one province could include 1,500 M-16s.

### The April 18 Meeting at the Doubletree Hotel

AA. On or about April 18, 2007, in the Eastern District of California, defendants Harrison JACK, Lo Cha THAO, Lo THAO, Chong

17

Yang THAO, Chue LO, Hue VANG, and Youa True VANG met with the undercover agent in a room at the Doubletree Hotel, 2001 Point West Way, Sacramento, California. During the meeting, the undercover agent showed them a crate containing 5 AK-47 machine guns. The defendants at the meeting spoke among themselves in a language other than English. Hue VANG, Lo Cha THAO, and Harrison JACK conversed with the undercover agent in English. They expressed the desire to purchase a large quantity of machine guns, primarily AK-47s and M-16s with M-203 grenade launcher. They asked the undercover agent if he could deliver them to various staging areas in Thailand along the Laos border. The defendants explained that the time line depended on the outcome of an ongoing intelligence mission in Laos.

## The April 24th Meeting at the Hilton

BB. On or about April 24, 2007, in the Eastern District of California, defendants Lo Cha THAO and approximately 7 other uncharged associates of Lo Cha THAO met with the undercover agent in a hotel room at the Hilton Hotel in the Natomas section of Sacramento. When in the room, all of the men personally inspected 5 AK-47s in a crate, 3 AT-4 anti-tank rockets, 1 M-14 rifle, and 1 Stinger missile with pistol grip and firing mechanism. The undercover agent had a discussion about the Stinger missiles with THAO. The undercover agent asked him how many he needed, and how far apart they would be. THAO indicated

18

that they would need them in the Northern Province of Laos and also down in the South near Vientiane. The undercover agent advised THAO that he would need one firing mechanism at each location. THAO said then that they would purchase two missiles and pistol grip firing mechanisms and two missiles for each.

### Communications After the Hilton Meeting

CC. On or about May 3, 2007, in the Eastern District of California, defendant Harrison JACK met with the undercover agent at a bar and grill in Sacramento. JACK told the undercover agent that he had Lo Cha THAO standing by to speak with him, at which point JACK utilized his cell phone to call Lo Cha THAO. JACK told THAO that the undercover agent had the proper infra-structure in place to deliver the weapons to their locations in Thailand. The undercover agent then spoke with Lo Cha THAO, who told him that JACK had answered his questions concerning the delivery of the weapons. Lo Cha THAO told the undercover agent that he (THAO) was waiting for intelligence from Thailand regarding the drop locations and that they were also in the process of interviewing and selecting prospective leaders who could mobilize people in Laos to carry out their plans.

DD. On or about May 7, 2007, in the Eastern District of California, defendant Harrison JACK called Lisa (LNU) (at the time) and left a message for Lisa asking her to call him. JACK said that he had a gentleman by the name of (undercover agent's

19

cover name) who was offering some assistance to the Hmong
community and nobody knew who he was.  JACK said on the message
that he wanted to do some "due diligence" and asked if she would
call him.

EE.  On or about May 7, 2007, in the Eastern District of
California, defendant Harrison JACK called Lo Cha THAO and asked
THAO if he was in a position to give the numbers.  THAO replied
that he wanted JACK to calculate one hundred thousand for all the
"ammos" (referring to ammunition) and the AK-47s.  JACK agreed
and suggested that they also include some "pyrotechnic"
(referring to smoke grenades).  Lo Cha THAO told JACK that those
items will come in the second order because the first order is
going to be by ground.  Lo Cha THAO told JACK that they will not
need pyrotechnic because the order is not going to be by air.
JACK told Lo Cha THAO that the people on the ground will need
them (smoke grenades) in hand prior to the second shipment in
order to mark drop locations and landing zones.  Lo Cha THAO
agreed with JACK, who told Lo Cha THAO that they will only need
about a dozen smoke grenades.  JACK told Lo Cha THAO to "trust me
on this one."

FF.  On or about May 9, 2007, in the Eastern District of
California, defendant Harrison JACK called called Lisa (last name
unknown).  JACK left a message for Lisa telling her that he has
an individual by the name of (undercover agent's name) who might

20

be an undercover FBI agent. JACK asked Lisa to run the under-
cover agent's name and number through the checks she has. JACK
told Lisa that he would be in touch.

GG. On or about May 9, 2007, in the Eastern District of
California, defendant Harrison JACK spoke with defendant Lo Cha
THAO. Lo Cha THAO told Jack that he had met with a personal
friend during his trip to the mid-west the past week. Lo Cha
THAO advised JACK that the friend questioned his relationship
with JACK and asked him if there was a high level of trust
between himself and JACK. Lo Cha THAO said that he trusted JACK.
His friend told him not to trust anyone else.

Lo Cha THAO said his friend told him that he knew about
these sting operations and that they will make you feel
comfortable but in the end they will get you. His friend told
THAO that funds could not be exchanged inside the United States.
The friend suggested going to Mexico or taking a boat into
international waters to avoid exchanging money inside the U.S.

The friend told THAO that if the undercover agent was not
willing to accept money outside the U.S., then the agent probably
was planning something. THAO said that he told the friend about
the meetings that occurred in the hotel and the friend asked him
if everything was set up prior to his arrival. When THAO told him
that everything had been arranged prior to his arrival, the
friend told him that it may have been set up and recorded.

21

HH. On or about May 9, 2007, in the Eastern District of California, defendant Harrison JACK told the undercover agent that he spoke with Lo Cha THAO, and Lo had received guidance over the weekend concerning the money transaction. JACK told the agent that Lo wanted to complete the payment for the shipment in Mexico, Thailand, or offshore in international waters.

II. On or about May 9, 2007, in the Eastern District of California, defendant Harrison JACK spoke with defendant Lo Cha THAO. JACK told THAO that he had spoken with the agent and that the undercover agent was willing to meet wherever THAO wanted. JACK told THAO that he felt comfortable with the situation. THAO replied, "Ok, we'll give it to you and then you give it to him." (meaning the payment to the undercover agent). JACK told Lo Cha THAO that the agent can have the first shipment in Thailand on May 29, 2007. THAO replied that he will be in Washington D.C. JACK told THAO that he would have to come up with a delivery date.

JJ. Later in the day on or about May 9, 2007, in the Eastern District of California, defendant Harrison JACK spoke with defendant Lo Cha THAO. JACK told THAO that the agent was going to replace 10 of the 125 AK-47 machine guns which JACK and Lo Cha THAO had ordered from the undercover agent with 10 Krinkovs. JACK explained to THAO that a Krinkov is a shortened AK-47-style rifle with a folding stock, and is convenient and

22

compact. THAO asked if it was an additional cost and JACK replied that it wasn't. JACK told THAO that the agent needed his arrival date so he could coordinate delivery. THAO told JACK that he will provide it. JACK told THAO that he would call the agent on Friday, May 11, 2007, with all the critical information, and THAO agreed.

LL. On or about May 10, 2007, in the Eastern District of California, defendant Harrison JACK spoke with defendant Lo Cha THAO. JACK told Lo that the agent was willing to make all arrangements and accept payment in Thailand. JACK indicated that this is a good thing and that he felt comfortable with the agent and his credibility. JACK provided the dates of June 11 for the arrival of the shipment with June 12 as the delivery date. JACK also told THAO that the agent would like half payment on June 9, in Thailand, with the final payment upon delivery. THAO told JACK that he had no problem with the dates and payment arrangements.

## The May 11 Meeting

MM. On or about May 11, 2007, in the Eastern District of California, defendants Harrison JACK and Lo Cha THAO met with the undercover agent at a bar and grill in Sacramento. THAO told the agent that JACK had provided him with the agent's proposed delivery dates. THAO said they were trying very hard to make sure everything was in place to facilitate delivery as the agent

23

had instructed. THAO told the agent that they were sending nine or ten people overseas with "ten each" in order to avoid being questioned. The agent told THAO that he would call him and suggested that they meet in Bangkok prior to the weapons being delivered.

The agent asked THAO if the second order was to be delivered by land or air, and THAO replied that it would depend on how well their mobilization was going. JACK asked Lo if they (Hmong insurgents) were at rallying points right now, and THAO replied, "Yes." JACK also told the agent that he had spoken to one of their strategic planners and was told that they had men in place. Lo told the agent that he wanted the agent's men to do a "quick set up" in Vientiane, and said that any disaster would send the Laotian government out of the country.

Lo Cha THAO told the agent that he wanted seven or eight key government buildings blown up at the same time. The agent asked THAO how much damage he wanted done to the buildings, and THAO replied "like September 11th." THAO replied that his people have been trying to overthrow the communist government for 35 years and they need the buildings to be brought down.

JACK also asked THAO if the buildings should not be left standing so that they could be repaired and rebuilt after they take over. THAO responded, "No." THAO said that if the buildings were destroyed, the people would realize that the

24

communists no longer were in control. THAO said that if there was destruction of the important government buildings, then the ruling class of Laos would get on an airplane and fly out to Vietnam.

Lo Cha THAO thanked the undercover agent for agreeing to handle payment in Thailand and told him that there were 120,000 Montagnards (indigenous mountain tribe people of Southeast Asia) in the Golden Triangle who also wanted equipment (weapons). THAO explained that once they saw the first shipment arrive, the agent would have their trust. THAO told the agent that he would need AK-47s, LAW rockets (Light Anti-Tank Weapons), AT-4 anti-tank rockets and Claymore mines.

NN. On or about May 14, 2007, in the Eastern District of California and elsewhere, defendant Lo Cha THAO spoke with a personal friend to whom he referred in an earlier conversation with defendant JACK. In the conversation on May 14, the friend asked THAO if THAO had followed up on his advice from their meeting the week before. The friend asked Lo Cha THAO if THAO had handled it as he had suggested. THAO said that, "Yes," he had. Lo said that he "sat down with them and the whole exchange was going to take place in Thailand." The friend responded, "That's a smart decision. Then there is no chance for a problem."

25

The May 21 Conversation Between JACK and Lo Cha THAO

OO.  On or about May 21, 2007, in the Eastern District of California, defendants Lo Cha THAO spoke with defendant Harrison JACK.  JACK and THAO engaged in a lengthy discussion of operational options and tactics on the ground in Vientiane.  THAO passed along a large amount of intelligence that one of the conspirators' operatives has been collecting in Vientiane.

They discussed a location currently being "scouted/ watched" (which appears to be the Lao Royal Palace).  They discussed fortifications and security, drawing a parallel to the White House.  JACK asked if the place includes the living quarters, to which THAO replied it's where all the Cabinet meets.

JACK asked about the most vulnerable point in Vientiane, and THAO stated that it's the Capitol.  THAO talked again about his person on the ground and how far away it is (presumably the Capitol building)( THAO does not come out and say it directly).

JACK said that the next time THAO talks to his person on ground, he should identify the gate guard changes, including how they rotate, how many people rotate and where (specific locations – along a wall or is there a checkpoint or is there an entrance area).  JACK stated that there's a lot of little things like that.

THAO told JACK he's got a man on the ground that's walking around like a tourist with his digital camera, trying to get whatever pictures he can.  They discussed recommendations for

26

gaining access and how certain ways are impossible.  JACK then inquired about any "soft spots" around the perimeter of the wall or fence; meaning any areas which are less guarded or more vulnerable.

JACK asked if THAO will have people continuously on the ground in Laos.  THAO said yes, and that he's got everything mobilized. JACK said if the undercover agent has questions about specifics, how long would it take for THAO to coordinate intel from the ground?  THAO said he can realistically get intel from the ground within 48 hours.

PP. On or about May 21, 2007, in the Eastern District of California, defendant Harrison JACK engaged in a discussion with the undercover agent, during which JACK passed along to the undercover agent the same information as described above in the preceding paragraph.

## The May 23 Meeting

QQ.  On or about May 23, 2007, in the Eastern District of California, defendants Harrison JACK, Lo Cha THAO, President Lo THAO and Chong Yang THAO met with the undercover agent at a bar and grill in Sacramento.  Lo Cha THAO pulled out a map of Thailand and Laos and identified several locations near the Thailand-Lao border where the undercover agent could deliver weapons.  Lo Cha THAO showed the agent two locations on the map and said he wanted the first shipment divided and delivered to

27

those locations.  The undercover agent told Lo Cha THAO that there was increased risk involved in splitting up the first load and said that he could deliver the weapons shipment that way if he wished.

The undercover agent told Lo Cha THAO that he could deliver the second load of weapons and equipment 7 days after the first load.  Harrison JACK suggested that Lo Cha THAO choose three or four delivery locations where shipments could be continuously received.  Lo Cha THAO said even if he pinpointed the delivery locations, the undercover agent would have difficulty finding the locations.  The agent suggested that Lo Cha THAO purchase GPS units to mark the delivery locations.

Lo Cha THAO advised the undercover agent that the second load of weapons and equipment would be wanted 7 days after the first load.  Lo Cha THAO indicated that it would take three or four loads to handle their needs for arms and munitions.

Lo Cha THAO said that there were a lot of groups "on the move."  Defendant JACK asked Lo Cha THAO how many groups, and he answered, "a lot."  He indicated that it was more than 10 groups. Harrison JACK advised that all groups should be outfitted with a GPS mechanism so that all groups know where all the other groups are at any given time.  JACK said that it was important that all groups be on the same frequency so they can communicate.  One group may get stopped in their advance, and it may be necessary

28

to divert troops as a result.

Harrison JACK pointed out to Lo Cha THAO that when the government buildings came down, THAO had to have troops in place outside the buildings ready to take over and "do what they need to do. That is how you cut the head off the snake."

Towards the end of the meeting, the undercover agent asked Lo Cha THAO if General VANG Pao was completely on board with all this, and whether VANG Pao agreed with the operational plan. THAO said that "Yes," General VANG Pao was fully engaged in the discussion and was on board. THAO said, "We're the masterminds on this so the Generals don't get into trouble." THAO said that General VANG Pao wants to walk into Vientiane before he dies. THAO finished the conversation by joking that, "Colonel Jack is going to be my Prime Minister."

All in violation of Title 18, United States Code, Sections 371 and 960.

COUNT TWO: [18 U.S.C. § 960 - Violation of Neutrality Act]

Beginning on a date unknown, but no later than on or about November 1, 2006, and continuing until on or about June 3, 2007, in the Eastern District of California and elsewhere, defendants

> HARRISON ULRICH JACK,
> GENERAL VANG PAO,
>   aka Pao Vang,
>   aka Vang Pao,
> LO CHA THAO,
> LO THAO,
>   aka President Lo Thao,
>   aka Xai Lo Thao,

```
YOUA TRUE VANG,
  aka Joseph Youa Vang,
  aka Colonel Youa True Vang,
HUE VANG,
CHONG YANG THAO,
SENG VUE,
CHUE LO,
```

did knowingly begin, and provide and prepare a means for and
furnish the money for and take part in a military expedition or
enterprise to be carried on against the territory and dominion of
the foreign and sovereign nation of Laos, the nation and people
of which the United States is at peace,

All in violation of Title 18, United States Code, Section
960.

COUNT THREE:   [18 U.S.C. § 956(a) - Conspiracy to Kill, Kidnap,
               Maim and Injure Persons in a Foreign Country]

1.   Paragraphs 1 though 14 and 17 through 35 of count one of
this complaint are hereby referenced and incorporated as if
realleged herein.

2.   Beginning on a date unknown, but no later than on or
about November 1, 2006, and continuing until on or about June 3,
2007, in the Eastern District of California and elsewhere,
defendants

```
HARRISON ULRICH JACK,
GENERAL VANG PAO,
  aka Pao Vang,
  aka Vang Pao,
LO CHA THAO,
LO THAO,
  aka President Lo Thao,
  aka Xai Lo Thao,
YOUA TRUE VANG,
  aka Joseph Youa Vang,
```

30

            aka Colonel Youa True Vang,
        HUE VANG,
        CHONG YANG THAO,
        SENG VUE,
        CHUE LO,

defendants herein, did conspire, combine, confederate and agree

with each other and others both known and unknown to the grand

jury, regardless of where such person or persons were located, to

commit at any place outside the United States an act which would

constitute the offense of murder, kidnapping or maiming if

committed in the special maritime and territorial jurisdiction of

the United States, and in furtherance thereof did commit an act

within the United States to effect an object of the conspiracy,

    All in violation of Title 18, United States Code, Section

956(a).

COUNT FOUR: [18 U.S.C. § 956(a) -Conspiracy to Damage or Destroy
            Property within and belonging to a Foreign Country]

    1.   Paragraphs 1 though 14 and 17 through 35 of count one of

this complaint are hereby referenced and incorporated as if

realleged herein.

    2.   Beginning on a date unknown, but no later than on or

about November 1, 2006, and continuing until on or about June 3,

2007, in the Eastern District of California and elsewhere,

defendants

        HARRISON ULRICH JACK,
        GENERAL VANG PAO,
          aka Pao Vang,
          aka Vang Pao,
        LO CHA THAO,
        LO THAO,

31

        aka President Lo Thao,
        aka Xai Lo Thao,
    YOUA TRUE VANG,
        aka Joseph Youa Vang,
        aka Colonel Youa True Vang,
    HUE VANG,
    CHONG YANG THAO,
    SENG VUE,
    CHUE LO,

did conspire, combine, confederate and agree with each other and
others both known and unknown to the grand jury, regardless of
where such person or persons were located, to damage or destroy
specific government property situated within a foreign country
and belonging to a foreign government or to any political sub-
division thereof with which the United States is a peace, and any
railroad, canal, bridge, airport, or other public utility, public
conveyance, or public structure, or any religious, educational or
cultural property so situated, and in furtherance thereof did
commit an act within the United States to effect an object of the
conspiracy,

    All in violation of Title 18, United States Code, Section
956(b).

COUNT FIVE: [18 U.S.C. § 2332g -Conspiracy to Receive and possess
            Missile Systems Designed to Destroy Aircraft]

    1.   Paragraphs 1 though 14 and 17 through 35 of count one of
this complaint are hereby referenced and incorporated as if
realleged herein

    2.   Beginning on a date unknown, but no later than on or
about November 1, 2006, and continuing until on or about June 3,

                                32

2007, in the Eastern District of California and elsewhere,

defendants

> HARRISON ULRICH JACK,
> GENERAL VANG PAO,
>   aka Pao Vang,
>   aka Vang Pao,
> LO CHA THAO,
> LO THAO,
>   aka President Lo Thao,
>   aka Xai Lo Thao,
> HUE VANG,
> CHONG YANG THAO,

did conspire, combine, confederate and agree with each other and others both known and unknown to the grand jury, to knowingly acquire, transfer directly or indirectly, receive, possess, export or use, and attempt to possess and use an explosive or incendiary rocket or missile that is guided by any system designed to enable the rocket or missile to seek or proceed towards energy radiated or reflected from an aircraft or toward an image locating an aircraft, and otherwise direct or did guide the rocket or device towards an aircraft, and a device designed or intended to launch or guide such a rocket or missile,

All in violation of Title 18, United States Code, Section 2332g.

COUNT SIX: [18 U.S.C. § 371- Conspiracy to Receive and Possess Firearms and Destructive devices, 18 U.S.C. § 922(o), 26 U.S.C. § 5861]

1. Paragraphs 1 though 14 and 17 through 35 of count one of this complaint are hereby referenced and incorporated as if realleged herein.

33

2. Beginning on a date unknown, but no later than on or about November 1, 2006, and continuing until on or about June 3, 2007, in the Eastern District of California and elsewhere, defendants

> HARRISON ULRICH JACK,
> GENERAL VANG PAO,
>   aka Pao Vang,
>   aka Vang Pao,
> LO CHA THAO,
> LO THAO,
>   aka President Lo Thao,
>   aka Xai Lo Thao,
> YOUA TRUE VANG,
>   aka Joseph Youa Vang,
>   aka Colonel Youa True Vang,
> HUE VANG,
> CHONG YANG THAO,
> SENG VUE,
> CHUE LO,

did conspire, combine, confederate and agree with each other and others both known and unknown to the grand jury, to commit offenses against the United States as follows:

(a) to knowingly transfer and possess one or more machine guns, in violation of Title 18, United States Code, Section 922(o); and

(b) to knowingly receive and possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record, in violation of Title 26, United States Code, Section 5861.

All in violation of Title 18, United States Code, Section 371.

AFFIDAVIT OF SPECIAL AGENT **REDACTED**
IN SUPPORT OF A CRIMINAL COMPLAINT

I, **REDACTED**, being duly sworn, hereby depose and state:

## BACKGROUND AND EXPERTISE OF AFFIANT

1. I am a Special Agent (SA) employed by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), United States Department of Justice, and I have been so employed for the past seven years. I am assigned to full-time duties in the San Francisco Field Division, and during my employment I have conducted and/or participated in several investigations related to the possession and/or manufacture of firearms, ammunition, and explosive devices in violation of Titles 18 and 26 of the United States Code.

2. I have a Bachelor of Science degree in Criminal Justice from National University of San Diego, California. I am a graduate of the Criminal Investigator School, Federal Law Enforcement Training Center, and ATF New Professional Training Course. These courses are approximately 23 weeks in length. As a result of my training and experience as an ATF agent, I am familiar with federal criminal laws. Prior to my service as an ATF agent I was in the United States Navy, assigned for ten years to Naval Special Warfare as a member of the SEA AIR and LAND (SEAL Teams). I have received specialized training in the identification, construction, and deployment of firearms, silencers, and improvised explosive devices. Additionally, I have training in conducting unconventional warfare and disrupting infrastructure.

1

1       3.    As part of my current duties, I investigate violations
2  of the federal explosives and firearms laws, and I investigate
3  those individuals who illegally manufacture, possess, transport,
4  or transfer unregistered machineguns or destructive devices, as
5  well as those who illegally possess firearms and silencers.

6       4.    As a result of my training and experience, I am
7  familiar with federal firearms laws and know that under 18 U.S.C.
8  § 922(o)(1), except in certain circumstances, it is unlawful for
9  anyone to possess a machinegun.  I also know that it is a
10 violation of 26 U.S.C. § 5861(d) for anyone to possess a
11 machinegun without having such device registered to him or her in
12 the National Firearms Registration and Transfer Record.

13      5.    Because this affidavit is being submitted for the
14 limited purpose of securing authorization for a criminal
15 complaint for violations of various sections of Titles 18 and 26
16 of the United States Code, I have not included each and every
17 fact known to me concerning this investigation.  I have set forth
18 only the facts that I believe are necessary and appropriate to
19 establish probable cause for the complaint.

20                          **INTRODUCTION**

21      6.    The facts set forth in this affidavit to support a
22 finding of probable cause were generated from my own investiga-
23 tion and related federal investigations in the Eastern District
24 of California and elsewhere; conversations with other law en-
25 forcement officers; review and analysis of information received
26 from various sources, including evidence provided pursuant to
27 subpoenas; physical surveillance conducted by ATF and other
28 federal and local law enforcement agencies, which has been

                                    2

1 reported to me either directly or indirectly; public records; a
2 review of telephone toll records and subscriber information;
3 Electronic interception of Target Telephones #1 and #2 used by
4 co-conspirator Harrison Ulrich JACK and Target Telephone #3 used
5 by co-conspirator Lo Cha Thao, and information from other
6 reliable confidential sources.

7    7.  Based on the evidence summarized below, probable cause
8 exists to believe that Harrison U. Jack, General Vang Pao, aka
9 Pao Vang, aka Vang Pao, Lo Cha Thao, Lo Thao, Chong Vang, Youa
10 True Vang, aka Joseph Youa Vang, aka Colonel Youa True Vang, Hue
11 Vang, Chong Yang Thao, Seng Vue, Chue Lo, Nhia Kao Vang, Salen
12 Tong Va Lor, Jerry Smith Vang, Noa Pao Vang, Gary George, and
13 John Does I through V have committed the following crimes in the
14 Eastern District of California:

15    - conspiracy to kill, maim or injure persons in a
      foreign country with which the United States is at peace,
16    in violation of 18 U.C.C. § 956(a);

17    - conspiracy to damage property in a foreign country with
      which the United States is at peace, in violation of 18
18    U.S.C. § 956(b);

19    - conspiracy to violate the Neutrality Act, in violation of
      18 U.S.C. §§ 371 and 960;
20
      - violation of the Neutrality Act,  in violation of
21    18 U.S.C. § 960;

22    - conspiracy to receive and possess missile systems
      designed to destroy aircraft, in violation of
23    18 U.S.C. §§ 371 and 2332g;

24    - attempted to receive and possess missile systems
      designed to destroy aircraft, in violation of
25    18 U.S.C. § 2332g;

26    - conspiracy to receive and possess machine guns, in
      violation of 18 U.S.C. §§ 371 and 2332g; and
27

28

3

1     – conspiracy to receive and possess destructive devices,
      in violation of Title 18, United States Code, Section
2     371, and Title 26, United States Code, Section 5861.

3                   **FACTS SUPPORTING PROBABLE CAUSE**

4         8.   Harrison Ulrich JACK came to ATF's attention in the

5    Fall of 2006 when he reached out to a defense contractor whom he

6    knew and inquired about purchasing 500 AK-47s.   JACK provided the

7    contractor with a résumé listing his telephone numbers.   The

8    defense contractor was very concerned, and went to the Phoenix

9    ATF office.   Agents from ATF-Phoenix met with him and placed a

10   phone call to JACK.   The Phoenix field office referred the matter

11   to the San Francisco field division.   ATF-San Francisco assigned

12   it to Sacramento because JACK lives in a Sacramento suburb.

13        9.   In early January 2007, I contacted Harrison Ulrich JACK

14   by telephone and began my undercover investigation.   Once I

15   received the lead from ATF-San Francisco, I made a recorded call

16   to JACK, saying, "I have the answer to your problem."   JACK

17   replied, "What problem?"   To which I responded, "The problem that

18   you spoke to [defense contractor] about."   During that first

19   telephone conversation, JACK and I set an appointment to meet

20   face-to-face.

21        10.   On January 25, 2007, I posed as an arms dealer and met

22   with JACK to discuss the sale of 500 AK-47s to General VANG Pao.

23   This conversation was recorded.

24        11.   I was able to determine from a résumé that JACK

25   circulated in the defense community, the West Point Registry of

26   Graduates, and military records that Harrison JACK is a graduate

27   of the United States Military Academy at West Point, class of

28                                    4

1  1968, and that he was commissioned into the Infantry branch of

2  the Army.  JACK graduated from Infantry Officer Basic School,

3  Ranger School, and Airborne School.  He served on active duty in

4  the United States Army until 1977, during which time he served at

5  least one combat tour in Southeast Asia.  In 1977, JACK left

6  active duty and joined the California National Guard.  JACK

7  retired from the National Guard with the rank of Lieutenant

8  Colonel.

9      12.   JACK's résumé and documents issued by various offices

10  of California state government indicate that JACK lives in

11  Woodland, California and operates a consulting business focusing

12  on environmental issues.  JACK apparently has had numerous

13  contracts and assignments with the California National Guard, the

14  California Department of Homeland Security, and various state and

15  local commissions and boards.

16      13.   JACK advised me that he wanted to purchase approxi-

17  mately 500 AK-47 automatic assault rifles.  An AK-47 rifle is an

18  automatic weapon manufactured in former Soviet Block countries,

19  primarily Russia, other former Soviet Republics, and Poland.

20      14.   An automatic weapon is one that will fire more than one

21  round, or bullet, without manual reloading, with a single

22  function of the trigger.  It is a violation of federal law in the

23  United States to possess, transfer, or receive automatic weapons

24  unless authorized by law, such as member of the military who are

25  assigned these weapons as part of their military mission, or

26  unless registered with the National Firearms Registry maintained

27  by the Bureau of Alcohol, Tobacco, Firearms and Explosives.

28

5

1    15.  During that January 25, 2007 meeting, JACK indicated
2  that he and General VANG Pao wished to take delivery of these
3  automatic weapons in Laos, at specific locations they would
4  identify later.  JACK said he works directly for General VANG Pao
5  and had worked for the Hmong community for the past ten years.
6  JACK also said that he previously had worked with General VANG
7  Pao on local, domestic programs, but that this was the first time
8  he has worked on anything military-oriented.

9    16.  During this meeting, JACK and I discussed the purchase
10  price for 500 AK-47 machineguns.  I told him that the AK-47s
11  would cost $800 per weapon.  Additionally, I told JACK that I
12  required half of the payment upfront, before any of the weapons
13  would move, and the remainder of the payment upon delivery.  JACK
14  told me "they" [which I interpreted as the Neo Hom] have the
15  cash.

16    17.  JACK also asked me during the January 25, 2007 meeting
17  if I would be able to provide soldiers who could conduct special
18  operations.  JACK told me the Laotian government was engaging in
19  genocide against the Hmong people living in Laos, and that the
20  Hmong community was very sensitive about protecting their people.
21  JACK said General VANG Pao was the one trying to get weapons to
22  the Hmong people in Laos.

23    18.  On February 1, 2007, I made a recorded telephone call
24  to Harrison JACK.  I told JACK the framework was in place to
25  deliver weapons and 24 "guys" [meaning mercenaries] into Laos.
26  JACK asked me if those items could be delivered to a latitude and
27  longitude.  I told JACK that they could.  JACK said he had a

28
                                    6

1 meeting the following day at which he would be able to pass along
2 the information.  JACK then asked what the next step would be if
3 he received interest concerning the additional information.  I
4 told JACK we would have to meet the following week, and I would
5 lay out everything I had [meaning weapons for display] and they
6 would be able to touch, or even shoot, some of the weapons.  JACK
7 said he would set things up and asked the price for transporting
8 weapons and for providing mercenaries, either by day or by team.
9 I told JACK the price depended on whether they wanted the
10 mercenaries training people or conducting operations (the word
11 "mercenaries" was not used; JACK and I would use "guys" or "your
12 guys" in place of "mercenaries.")

13      19.  On Monday, February 5, 2007, I received a voicemail
14 message from JACK stating that Wednesday would be an ideal day to
15 meet.  JACK said that the highest leadership, including General
16 VANG Pao, would be present for the meeting, "which is exactly
17 what you need by way of credibility and guarantee."  JACK asked
18 me to give him a call later in the day because he was expecting a
19 call from his Hmong point-of-contact following a Hmong clan
20 meeting.  JACK asked me to call him at his home telephone number.

21      20.  On that same day, at approximately 10:13 a.m., I was
22 leaving a voicemail message on JACK's cellular telephone when
23 JACK telephoned me from his home telephone.  JACK said he was on
24 the other line with General VANG Pao.  JACK said he was going to
25 bring four or five people with him, including General VANG Pao;
26 Jack indicated, "That's your number one person.  Okay?"  I told
27 JACK I needed to limit the number of people viewing the weapons

28

7

1   at any one time. I told JACK that I was concerned for my safety
2   and, for that reason, only a few people would be permitted to
3   view the weapons at any one time. JACK said he understood and
4   told me he would advise General VANG Pao that only two
5   individuals could look at the weapons at one time. JACK also
6   said that these men were General VANG Pao's trusted people with
7   whom he fought in Laos and that General VANG Pao was just as
8   worried about his personal safety. I told JACK that at our next
9   meeting we would have lunch and then walk to another location to
10   view the weapons, at which time General VANG Pao and his
11   associates could choose which ones they wanted. This call was
12   recorded.

13      21. On February 7, 2007, acting in an undercover capacity
14   as an arms dealer, I met with JACK, General VANG Pao, and
15   approximately twelve suspected Neo Hom leaders concerning the
16   sale of weapons to Neo Hom. [Again, at no time has the term "Neo
17   Hom" been used by any of the suspects in my presence to identify
18   their affiliation.] The lunchtime meeting took place in Amarin
19   Thai Restaurant in Sacramento, California. JACK and I had
20   previously agreed that I would show him samples of the arms and
21   munitions that I had available for sale. I wore a recording
22   device on my person during this meeting. Additionally, ATF has
23   used the services of an interpreter to interpret the side
24   conversations in a language other than English that occurred and
25   were recorded during the meeting.

26      The participants of at the meeting have been identified by
27   comparing the videotape of the attendees with known photographs
28   of the subjects. The attendees were: Harrison Jack, General Van

1  Pao, General Vang Pao's wife, Youa True Vang, Chong Vang, Lo
2  Thao, Lo Cha Thao, Chong Yang Thao, Seng Vu, Nao Pao Vang, Chu
3  Lo, Wa Thao Vang, Hue Vang, and two as-yet unidentified males.

4  22. During lunch, JACK and General VANG Pao advised me that
5  the plan was to provide arms to insurgents who were in place in
6  Laos, and to initiate hostile military action in the very near
7  future against military forces of the government of Laos. I was
8  advised that the insurgents would attack Lao government soldiers
9  and positions and attempt to gain control of certain areas of the
10  border between Laos and Thailand. I was also advised that the
11  two dozen special operations mercenary troops, which I was being
12  asked to provide, would play a large role in the insurgent
13  military operation. I told JACK and General VANG Pao that any
14  special operations troops that I would be able to provide would
15  be very conspicuous, and that it would be necessary for them to
16  "melt" back into the jungle in Laos immediately after completion
17  of the "strike" mission against the Lao government troops. I
18  told them that the mercenary troops could not be used to secure
19  and maintain positions along the border. JACK stated that they
20  understood.

21  24. During the meeting at the restaurant on February 7,
22  2007, I told JACK and General VANG Pao that I needed to have them
23  show me on maps exactly where they needed me to insert both the
24  troops and munitions. We discussed that if both the troops and
25  munitions were to be air-dropped into Laos (i.e., parachute
26  insertion) as they wanted, I would need to identify the usable
27  drop zones. They stated that they understood and could provide
28  me with maps showing the points of insertion, as well as the

9

1    emplacement of insurgent troops and Lao government troops.

2        25.   I told JACK and General VANG Pao that I needed to get
3    an operational briefing from someone doing the operations
4    planning for their insurgent operation, as well as copies of the
5    operations plan. I explained that I needed to develop my own
6    operations plan and operations order for the transfer and
7    delivery of the munitions and the air drop of both personnel and
8    munitions; moreover, I needed to ensure that my operations plan
9    and operations order were consistent with theirs. JACK and Lo
10   Cha THAO agreed to make those available to me.

11       26.   Prior to the meal, I produced a manila folder
12   containing a list of the prices and .quantities of weapons I had
13   for sale.  JACK and the Neo Hom members reviewed the document
14   during lunch at the restaurant.  At that time, JACK told me they
15   had maps, coordinates, and all the information necessary to
16   coordinate efforts to transport the weapons and mercenaries.
17   After the meal, I offered to display the weapons I had available
18   for sale.

19       27.   I walked JACK, General VANG Pao, and the other Neo Hom
20   members to a recreational vehicle (RV) that I had arranged to be
21   parked close to the Thai restaurant.  Audio and video recording
22   devices were used while the targets were in the RV.  JACK,
23   General VANG Pao, and approximately 12 Neo Hom members looked at
24   and/or handled the following firearms and explosives that they
25   believed were for sale:

26           1.   MP5K PDW (9mm sub-machinegun)

27           2.   MP5SD (silenced 9mm sub-machinegun)

28           3.   Colt M16A1 with M203 attachment (machinegun with

                                10

1           an attached 40mm grenade launcher)
2      4.   M16A2 (5.56mm machinegun)
3      5.   M-14 (7.62mm machinegun)
4      6.   Polish AKM (7.62mm AK-type machinegun)
5      7.   PKM (7.62mm belt-fed machinegun)
6      8.   M79 (40mm grenade launcher)
7      9.   RPG7B (rocket-propelled grenade launcher)
8      10.  Inert M67 fragmentation grenade (baseball-type
9           hand grenade)
10     11.  Inert M72A2 LAW (rocket-propelled anti-tank
11          weapon)
12     12.  Inert M18 Claymore mine (anti-personnel mine)
13     13.  Inert M112 Comp (C-4, commonly referred to as
14          "plastic  explosives")

15     28.  The individuals looking at the weapons spoke in a
16 language other than English and appeared to be very interested in
17 the weapons display.  I gave Hue VANG a (secretly marked) memory
18 stick and reader that contained photographs of the weapons I had
19 displayed in the RV.  I told Hue VANG that the memory stick
20 corresponded with the numbered price list/inventory I had
21 provided and that when communicating via telephone, VANG should
22 only use the numbers when referring to a weapon on the list.

23     29.  General VANG Pao viewed the weapons display and
24 commented on the AK 47-style weapon.  He stated that there was a
25 lot of ammunition for the AK-47 in his country [which I
26 understood as referring to Laos].  General VANG Pao also spoke
27 with the two other males in a language other than English and
28 then told me in English that I had very good material and that he

11

1  was "sold on the whole thing." Shortly thereafter, JACK and Hue
2  VANG entered the RV and provided me with maps of Laos that
3  identified Hmong and Laotian government troop locations; those
4  locations indicated where it was likely that Neo Hom would want
5  the weapons and mercenaries air lifted and parachuted into Laos.

6      30.  The conversations in the RV were video and audio
7  recorded.  I subsequently arranged for a Hmong interpreter, who
8  was made available by another federal agency, to listen to the
9  recordings and tell me what had been said.  The interpreter
10 stated that General VANG Pao told Chong Yang THAO that there were
11 many kinds there, but pointed specifically at the AK-47s and
12 M-14s in particular.

13     31.  On February 15, 2007, at approximately 7:03 p.m., I
14 telephoned JACK in an attempt to find out how the firearms
15 purchase was progressing.  During this recorded call, JACK said
16 he had just finished a major strategy meeting with approximately
17 22 senior leadership members.  JACK said that they [Neo Hom] were
18 in motion and had budgeted for virtually everything on the
19 weapons price/inventory list.  JACK said they were doing some
20 major fundraising and that he would call me on February 28, 2007.
21 JACK previously had told me that he would be going on vacation to
22 Mexico for 10 days on or about February 17, 2007.  During this
23 telephone call, JACK said that he would return on February 27 and
24 would call me on February 28.

25     32.  On March 2, 2007, I received a voicemail message from
26 JACK stating that Lo [Lo Cha THAO] and the Neo Hom leadership had
27 gone back to Wisconsin and Minnesota to generate political
28 support.  JACK said he only spoke to Lo [Lo Cha THAO] once since

12

1  returning from Mexico and didn't get a chance to talk about their
2  requirements. I understood this to mean that JACK and Lo Cha THAO
3  had not discussed the number and type of weapons Neo Hom wanted
4  to purchase from me. JACK invited me to deal directly with Lo
5  [Lo Cha THAO], who had attended the meeting in Sacramento and
6  whom Jack identified as General VANG Pao's principal lieutenant.
7  At that time, JACK provided THAO's cellular telephone number,
8  559-455-3793.

9      33.   During the afternoon of March 5, 2007, I met with JACK
10  at Hangar 17 Restaurant/Bar in Sacramento. I spent approximately
11  one hour and forty minutes with JACK, and during that time both
12  JACK and I each consumed two pints of beer and ate lunch. I wore
13  an audio recording device during the meeting and captured the
14  following conversation. I advised JACK that I did not feel
15  comfortable dealing directly with Lo Cha THAO. I told JACK that
16  I thought that he and I had a rapport, but that I did not trust
17  Lo Cha THAO or any of the others. Furthermore, I noted, I was
18  reasonably sure that they did not trust me either. JACK said
19  that he fully intended to remain involved.

20      34.   JACK advised me that approximately three weeks prior,
21  he organized and attended a conference call for all of the Hmong
22  leadership in the United States. JACK said that they dialed into
23  the call from the Hmong Headquarters in Fresno, California. JACK
24  said the meeting focused on strategic planning related to
25  political issues in Laos and that following the conference call
26  the group discussed the situation in Laos. JACK said some of the
27  "white folks" present during the meeting were becoming concerned
28  because they could see that the Hmong were not content with only

13

1  administrative efforts; they were looking at something
2  operational.  I understood this to mean that Neo Hom members were
3  discussing the take over of the Laotian government in the
4  presence of non-Neo Hom individuals.

5      35.  JACK said it was a little bit of a sensitive area and
6  that he and Lo [Lo Cha THAO] had to break up the group.  JACK
7  said he warned Lo that everybody had to make their own decision
8  as to the level at which they were willing to participate.  JACK
9  said he explained to the Neo Hom how close they were walking the
10  line - "They're right on the edge."  JACK said he told them not
11  to do anything over the phone and that the number of times they
12  meet should be counted on two fingers.  JACK said he discussed
13  breaking into separate cells and told the group that they needed
14  to function like a guerilla operation, as they had when they were
15  successful in Laos.

16     36.  JACK also told me during the March 5 meeting at Hangar
17  17 that he was a graduate of the U.S. Military Academy at West
18  Point.  JACK said that he had been involved in several
19  conversations with General VANG Pao and his group in which VANG
20  Pao and others wanted to get their objective immediately.  JACK
21  told me that he routinely had to explain to General VANG Pao that
22  operations needed to be planned and that steps had to be taken in
23  a certain order so that they would be successful.

24     37.  During the same meeting, JACK advised me that he had
25  contacted a California Highway Patrol (CHP) commissioner whom he
26  knew, and had arranged for General VANG Pao and 18 of the Hmong
27  leadership to assist in recruiting officers of Hmong heritage and
28  ethnicity as sworn law enforcement officers in the California

14

1  Highway Patrol.  [It is unknown whether that commissioner is
2  currently employed with the CHP.]  JACK said that General VANG
3  Pao and several of his associates were going to meet with senior
4  leadership of the Highway Patrol at the CHP academy in West
5  Sacramento on Wednesday, March 7, 2007.  JACK told me that the
6  more people from the Hmong community who were trained, the better
7  it would be once Neo Hom got into Laos.  JACK told me there was a
8  "residual" [benefit] to placing as many Hmongs in the CHP as
9  possible.  JACK said that once in Laos, they would be able to
10 have their internal security, operations, and road control set up
11 overnight.  I interpreted this to mean that Neo Hom intended to
12 use the law enforcement training the Hmong officers received from
13 CHP for the benefit of the new regime, if and when Neo Hom
14 succeeds in overthrowing the Lao government.

15       38.  JACK also implied that Neo Hom's intention was to get
16 as many persons who were, first and foremost, loyal to the Neo
17 Hom and General VANG Pao accepted as sworn CHP officers and then
18 get them trained by the California Highway Patrol, which has
19 among the best law enforcement training programs available.  JACK
20 further suggested that after the officers had been trained and
21 had graduated from the CHP academy, and after General VANG Pao
22 had successfully mounted the insurgency operation in Laos and
23 taken control of the country, the newly trained Hmong CHP
24 officers would abandon the CHP and move to Laos to take positions
25 of trust in the law enforcement departments of the new Lao
26 government that General VANG Pao and his Neo Hom associates would
27 establish.

28 ///

                                  15

1        39.  I told JACK that we needed to get together for a
2   planning meeting regarding the use of the mercenary soldiers.  I
3   told JACK that we needed someone present who knew what was going
4   on the ground.  JACK asked if I had looked at the maps they gave
5   me.  I told JACK the maps were no good and provided him with a
6   map of Laos that had been created for pilots.  JACK told me Neo
7   Hom had people "running" [operations] on a regular basis, and
8   JACK said that he had been shown an operation plan that had
9   fairly impressed him.

10       40.  JACK telephoned me on the afternoon of March 7, 2007.
11   JACK called the cellular telephone I use for undercover opera-
12   tions, and I recorded this call.  JACK told me he had spent the
13   day with the Hmong leadership at the CHP Academy and that there
14   had been some developments.  JACK told me the communists were
15   spraying "yellow rain" on villages and personnel and that people
16   were starting to drop.  JACK told me he had been in touch with
17   Amnesty International and that they were interested in helping
18   end the spraying.  JACK said that he had passed the map I had
19   provided during the meeting to the operations strategist.  JACK
20   said that all the communist leadership worked and lived in the
21   same location in Vientiane, Laos, and were guarded by disloyal
22   military security.

23       41.  I told JACK that "my guys" had recently obtained three
24   Stinger missiles (heat-seeking surface-to-air missiles capable of
25   shooting down aircraft) that could "help them out" with the
26   aerial spraying (meaning that the missiles could shoot down any
27   aircraft being used for aerial spraying).

28   ///

16

42. JACK told me that the Stingers might be something Neo Hom would be interested in and asked how soon the missiles could be in Laos. I told JACK it would take a couple of weeks.

43. On March 28, 2007, ATF initiated a court-authorized electronic surveillance on Harrison JACK's home and cellular telephones. Surveillance intercepted several calls between JACK and Target Telephone #3, a phone used by co-conspirator Lo Cha Thoa, during which JACK and Lo Cha THAO discussed issues pertaining to the enumerated offenses. These calls are described in detail below.

44. On March 30, 2007, I called Harrison JACK and JACK told me that "they" (meaning his Hmong contacts) had begun the collection process. He said they had less than $100,000 but expected to have more soon.

45. On March 30, 2007, Lo Cha THAO called JACK, at which time they discussed scheduling future meetings to review intelligence obtained from Laos about an alleged genocide against the Hmong in that country. JACK told THAO that he had spoken to me earlier that day. In reference to this discussion, JACK said, "I've got everything lined up," and "I've got a number of pieces in position." THAO responded by saying he and a few others wanted to "look at . . . just the things that we need as of right now." THAO say he wanted to consult with JACK in person about which of those things would be "more useful as of right now."

46. On April 3, 2007, I placed a call to Harrison JACK on his home telephone number. JACK asked if I would accept payment for the weapons in Thai baht. I told him that I would. I then advised JACK that the weapons inventory list I showed him and his

17

1  Neo Hom contacts on February 7, 2007 had changed due to a recent
2  sale.  I also advised him that twelve of the mercenaries who
3  could support military action against the government of Laos had
4  been committed to another operation and are currently unavail-
5  able.  We agreed to meet at a later date so I could provide him
6  with an updated inventory list.

7       47.  On April 4, 2007, Lo Cha THAO called Harrison JACK and
8  explained that he had just returned from a four-day planning
9  meeting.  He expressed the desire to meet with JACK and "the guy
10  with the equipment" [referring to me].  In response, JACK told
11  THAO that the list of available equipment changed due to a recent
12  sale.  JACK expected to receive an updated list soon and recom-
13  mended that THAO consider making periodic purchases.  He also
14  told THAO that I would accept payment in Thai baht.  THAO said
15  that General VANG Pao had ordered funding to be in place for a
16  purchase.

17       48.  On April 5, 2007, Harrison JACK called Lo Cha THAO at
18  THAO, and asked THAO how soon General VANG Pao would want to
19  "round up any of that equipment like we were talking about last
20  time."  THAO said a meeting scheduled for the following day would
21  address this issue.  THAO said the budget, which he described as
22  "standing by," consisted of contributions from community members
23  through the clan leadership.  THAO explained that he had asked
24  the money collectors to retain any envelopes containing the
25  checks, so THAO could respond later with thank you letters.

26       49.  On April 9, 2007, Lo Cha THAO called Harrison JACK at
27  JACK's home telephone.  During the conversation, JACK asked THAO
28  how large of an initial order is expected for the "equipment."

18

1   THAO said that he had an idea what the order would look like and
2   wanted to discuss the matter in person on Friday, April 13, 2007.
3   THAO said the purchase would be made in U.S. dollars, not Thai
4   baht.

5       50.   On April 11, 2007, I called Harrison JACK, at which
6   time JACK asked if I could meet with him the following day to
7   provide the updated inventory list.   JACK said there was another
8   Hmong party interested in buying weapons from me.   JACK requested
9   that I bring three copies of the inventory list, one for himself
10  and one for each of the interested parties.   JACK said he would
11  meet with "Hmong leadership" on Friday, April 13, 2007, to
12  forward the updated list and obtain additional information about
13  the other interested party.

14      51.   On April 12, 2007, I met with Harrison JACK at Hangar
15  17, a restaurant located at 1630 S Street, Sacramento, Calif-
16  ornia.   I provided JACK with three numbered copies of the new
17  inventory list.   After reviewing the list, JACK asked how many M-
18  67 fragmentation grenades, M-18 Claymore mines, and M72A2 LAW
19  rockets were in a case and whether the price reflected the price
20  of an individual item or a case.   JACK also asked if I had
21  detonation cord and blasting caps for the explosives on the list.
22  JACK told me he was going to Stockton, California the next day to
23  meet with leadership, some of whom he would be meeting for the
24  first time.   I asked JACK to obtain information about the other
25  potential customer at this meeting.   JACK told me his Hmong
26  contacts had raised a lot of money through "Air America" but had
27  not taken any money from the CIA.   JACK said the CIA would only
28  ///

19

1  meet with Lo Cha THAO and two others and would not meet with
2  JACK.

3       52.  JACK and I discussed a finder's fee for JACK's role in
4  brokering this and possible future deals for weapons.  I
5  suggested a flat $7,500 fee for the initial transaction and a 3%
6  fee for the next, presumably larger order.  JACK told me this
7  offer was close to what he contemplated.

8       53.  On April 12, 2007, Lo Cha THAO called Harrison JACK and
9  said he had participated in a conference call with an unnamed
10 United States congressman about what THAO described as "on the
11 table politics."  THAO also said, "But the under the table
12 politics, we are going to gear up all the equipment."  He further
13 explained that General VANG Pao would give the order pending the
14 outcome of an intelligence mission inside Laos to determine if an
15 unnamed person, with the proper equipment, could handle "the
16 coup."  THAO said that his group had been consulting with a
17 United States congressman and had received advice concerning
18 "under table strategies" from military personnel like Harrison
19 JACK and an unnamed "CIA guy."  THAO asked JACK to meet him on
20 April 13, 2007 at 8:30 a.m. in the parking lot of the K-mart
21 store at near Highway 99 and Farmington Road in Stockton
22 California.

23      54.  On April 13, 2007, agents conducted surveillance at the
24 K-mart parking lot at the intersection of Farmington Road and
25 Mariposa Road in Stockton, California.  At approximately 8:20
26 a.m., agents observed Harrison JACK arriving at the parking lot
27 in his green Jeep Cherokee, California license plate 4YQR003.
28 JACK remained parked near a gas station adjacent to the parking

20

1  lot for a few minutes.  During this time, Lo Cha THAO placed a
2  call from his cell phone to Harrison JACK's cellular telephone,
3  advising him that he had arrived in a Toyota Tundra and was
4  waiting in the K-mart parking lot under a tree.  JACK advised
5  that he would seek him out.

6       55.  At approximately 8:35 a.m., agents observed JACK
7  driving his vehicle to the center of the parking lot, where he
8  remained for at least 25 minutes.  At this time, JACK's vehicle
9  faced away from surveillance units, such that agents could not
10  see activity inside the vehicle.  An agent who drove past the
11  front of JACK's vehicle observed JACK inside it, on the driver's
12  side, with another unidentified individual in the front passenger
13  seat.  A white Toyota Tundra, California license plate 8F82647,
14  was parked nearby.  An unidentified Asian male appeared to be
15  patrolling the area around JACK's vehicle.

16       56.  After his meeting in Stockton, JACK left a voice
17  message on my cellular telephone, briefly explaining what was
18  discussed at the meeting.  I contacted him later that day on his
19  home telephone number.  JACK said he would be referring to notes
20  from his morning meeting during our call.  JACK said that he had
21  forwarded copies of the inventory list I gave him.  He said he
22  learned the Hmong guerrilla army in Laos is divided into regional
23  units with independent, clan-based leadership.  Each unit would
24  be activated for the war.  JACK said that during the meeting,
25  JACK met with a representative from "Military Region 1" in the
26  northern part of the country.  JACK explained that each unit is
27  seeking to procure its own equipment as part of a "master plan,"
28  which includes an ongoing intelligence assessment.  JACK said he

21

1  anticipated a series of equipment orders for this purpose.

2      57.  JACK said I should deliver the equipment to a staging
3  area in Thailand, and that the staging area is a residence near
4  the Laos border.  He provided the address.  JACK explained it is
5  occupied on a continual basis and has satellite communications
6  capabilities.  JACK said that his Hmong contacts still wanted to
7  hire mercenaries from me.  JACK estimated that they had millions
8  of dollars to spend and that an initial order for one "province"
9  could include 1,500 M-16s.

10     59.  On April 18, 2007, I met with Harrison JACK, Lo Cha
11 THAO, Lo THAO, Chong Yang THAO, Chue LO, Hue VANG, Youa True
12 VANG, and Richard Jellerson in a room at the Doubletree Hotel,
13 2001 Point West Way, Sacramento, California.  During the meeting,
14 I showed them a crate containing 5 AK-47 rifles.  The Hmong
15 individuals at the meeting spoke amongst themselves in a language
16 other than English.  Hue VANG, Lo Cha THAO, and Harrison JACK
17 conversed with me in English.  They expressed the desire to
18 purchase a large quantity of automatic rifles, primarily AK-47s
19 and M-16s with M-203 grenade launcher.  They asked me if I could
20 deliver them to various staging areas in Thailand along the Laos
21 border.  I told them I could.  I asked them for a timeframe.
22 They did not provide one, explaining that it depended on the
23 outcome of an ongoing intelligence mission in Laos.

24     60. On April 19, 2007, Harrison JACK received an incoming
25 call on his cell phone from Richard [LNU][now known to be Richard
26 Jellerson].  JACK and Jellerson discussed specifics of planning
27 and budgeting a mission.  During the conversation, Jellerson
28 asked JACK if they could arrange the possibility of sending the

1    me on a "LURP," (Long Range Reconnaissance Patrol) in Laos.   JACK
2    and Jellerson spoke about troop movements across the border
3    between Thailand and Laos.   JACK and Jellerson continued to talk
4    about funding and budgeting for the operation.   At the end of the
5    call, JACK told Jellerson to budget $10,000 for bribes.

6         61.   On April 23, 2007, federal agents manning the ATF wire
7    room advised me that they had intercepted a call from Harrison
8    JACK to me saying that Lo Cha THAO had been trying to contact me
9    and had left three messages on my cell phone voicemail.   I
10   checked my voicemail on the undercover cell phone and found two
11   messages from Harrison JACK about contacting Lo Cha THAO, and
12   three messages from THAO.   I returned the call the call to JACK,
13   who told me that THAO had been trying to get in touch with me to
14   set up a meeting.   JACK advised me that he thought that it might
15   be the final meeting before LO, General VANG Pao, and the others
16   placed a formal order.

17        62.   I returned the calls from Lo Cha THAO on April 23.   I
18   told him that I had been at the dentist and had not received his
19   messages until a few minutes before the call.   THAO said that he
20   wanted to get together with me the following day, April 24, and
21   that he was going to bring the "Secretary General/Treasurer."   I
22   asked THAO if he wanted me to get a hotel room for the meet.
23   THAO said, "No, the meeting will be quick."   I asked THAO if he
24   wanted to see anything, and THAO responded that he wanted to see
25   the AK-47s and the Stinger missiles.   I advised THAO that I would
26   get a hotel room in order to be able to show him the weapons.   I
27   advised him that my Stinger missiles were at a location out of
28   town and I did not think I could bring them on such short notice.

23

1 I advised him that I would bring the AK-47s. We agreed to meet
2 at 6:00 p.m. in Sacramento. I advised THAO to call me the next
3 day to arrange the location.

4      63. Lo Cha THAO called me the following day, April 24th.
5 THAO asked me to bring M-14 automatic rifles and Claymore mines.
6 I told him that I could not bring the Claymore mines, but would
7 bring an M-14. I told him to meet me at the Elephant Bar
8 restaurant in the Natomas section of Sacramento at 6:00 p.m.

9      64. Shortly before 7:00 p.m. on April 24, I returned a
10 telephone call to Harrison JACK, who advised me that he was in
11 the Seattle, WA area so I had to call him on his cell phone. I
12 advised JACK that I was waiting around for the arrival of Lo Cha
13 THAO and his group. JACK and I discussed the issue of a finder's
14 fee for JACK. We previously had discussed this issue, and JACK
15 indicated that he wanted a 5% commission on the total of the
16 order.

17      65. I advised JACK that Hue VANG had told me during a
18 previous meeting that the size of the order was going to be
19 10,000 items of firearms and munitions, and that the estimate for
20 the purchase was $9.8 million. I advised JACK that I could not
21 go 5% for the commission on $9.8 million, but that I would be
22 willing to go 5% for the on an order of $200,000, but would only
23 go 3% if the order were $3 million or more. JACK responded (in
24 part): "Well, I'll tell you, I will tell you what are ... my
25 thoughts are. Um, you know, the, the, the percentages that, well
26 put it this way ... its taken me ten years to put this together.
27 It's not just the last couple of months."
28 ///

24

1     66. I countered that I would pay him a commission of 4% on
2  the first $3 million, and then 3% on the amount over $3 million.
3  After some further discussion about the commission, I said, "Let
4  me one up you. ... I will go 5%. But I want to set up a deal with
5  them so I can go to Laos and conduct military training for their
6  special operations forces at a premium price." After some more
7  discussion, we settled on 5%.

8     67. Shortly thereafter, I received a call from THAO from his
9  cell phone.

10     68. A few minutes later, Lo Cha THAO arrived with 7
11  associates. I never had seen any of the people with THAO before.
12  There were six well-dressed, adult males with THAO, and one young
13  man, who appeared to be in his early 20s, dressed in casual
14  clothes. I told THAO that I would take half the group up into
15  the room, and then the second half could come later.

16     69. THAO, three adult male associates and the young man
17  proceeded to the undercover room. Another ATF agent was present
18  in the room. When in the room, I showed THAO and his associates
19  5 AK-47s in a crate, 3 AT-4 anti-tank rockets, 1 M-14 rifle, and
20  1 Stinger missile tube and firing mechanism. All of the men
21  personally inspected all the armament. I had a discussion about
22  the Stinger missiles with THAO. I asked him how many he needed,
23  and how far apart they would be. THAO indicated that they would
24  need them in the Northern Province of Laos and also down in the
25  South near Vientiane. I advised THAO that he would need one
26  firing mechanism at each location. He said then that they would
27  ///
28  ///

25

1 purchase two tubes and firing mechanisms and a number of rockets.

2 70. I commented to THAO that they wouldn't have to shoot
3 down too many Lao helicopters to achieve their purpose of
4 neutralizing air cover. I said that if they shot down two
5 helicopters, then the Lao military probably would stop flying.
6 THAO commented that he thought that they had only two
7 helicopters.

8 71. Shortly thereafter, the second group came up to the room
9 from the lobby, and we had approximately 10 people in the room.
10 All of the new people also inspected the armaments that were
11 present. As THAO left with this entourage, he said that Colonel
12 JACK would be in touch with me.

13 72. The participants at the meeting at the Hilton have been
14 identified by comparing videotape of the meeting with known
15 photographs of the subjects. The persons who attended the
16 meeting were Lo Cha Thao, Jerry Smith Yang, Salen Tong Va Lor,
17 Chong Kong, Song Ger Kong and Nhia Kao Vang.

18 73. On April 26, 2007 at approximately 10:00 a.m., Lo Cha
19 THAO called Harrison JACK on his (Jack's)cellular telephone.
20 During that call, THAO told JACK that the meeting with "Steve"
21 [me] the day before went well and that "[w]e're doing all the
22 layout planning everything, all the proposal structure." THAO
23 said that he would bring the proposal to JACK for his review.
24 When JACK asked THAO how "things are looking time wise," THAO
25 responded, "Ah, it should be good due to what I demand them to
26 do. I told them to talk to VANG Pao, and I told all of them to
27 get on, you know, and get all the good planning together, you
28 know. ... We got to have good planning there. Because if

26

1   something went wrong, then that's it, you know."   At the end of
2   the call, THAO tells JACK that he will call him tomorrow [April
3   27, 2007].

4       74.   On April 29, 2007, Harrison JACK telephoned me from his
5   home phone.   JACK called the cellular telephone I use for
6   undercover operations and left a message.   JACK said he was
7   following up on his last call and needed to give the leadership
8   some additional confidence on my capability to deliver to a
9   specific location.   I understood JACK's call to mean that there
10  was some doubt regarding my ability to produce weapons for
11  delivery into Thailand.   JACK asked that I call him.   (Due to an
12  equipment malfunction, this telephone call was not recorded.)

13      74.   On Tuesday, May 1, 2007, Harrison JACK called me on my
14  undercover cellphone.   JACK said that he wanted to meet with me
15  on Thursday in Sacramento.   We agreed to meet at 3:00 p.m. at the
16  Hanger 17 Restaurant in Sacramento.

17      75. On May 2, 2007 at approximately 8:00 a.m., Lo Cha THAO
18  call Harrison JACK's cellular telephone.   JACK did not answer the
19  call, and THAO left the following message: "Hey, Colonel.   It's
20  Lo again, trying to get a hold of you.   Please give me a call
21  ASAP.   That will be good.   Thanks.   Bye."

22      76.   On May 2, 2007, Harrison JACK called me and told me
23  that "they" (I understood his term to refer to the Neo Hom
24  organization) were just about to place an order with me.   JACK
25  said that there was some concern regarding my ability to deliver
26  the firearms to a specified "safe house" that would be located in
27  Thailand.   JACK also told me that "they" were securing safe
28  houses as we spoke and had indicated to him that they wanted me

27

1 to accompany JACK to Thailand so we could see the safe houses and
2 thereby ensure delivery.  I told JACK that we should meet in
3 order to discuss the delivery of equipment.  (Due to an equipment
4 malfunction, this telephone call was not recorded.)

5       77.  On Thursday, May 3, 2007, I met with Harrison JACK at
6 the Hanger 17 Restaurant in Sacramento.  I told JACK that I had
7 met with Lo Cha THAO and several other men.  I asked JACK if he
8 knew who other the men were since one of them appeared to be
9 carrying a gun.  JACK asked me if the guy carrying the gun had a
10 stocky build and told me that he had met a Riverside County
11 Deputy Sheriff who as a personal body guard to General VANG Pao.
12 JACK also told me that he presumed that some members of Neo Hom
13 had carried guns, but they kept them out of sight at the
14 direction of General VANG Pao.  I told JACK that Lo Cha THAO had
15 asked me to update the weapons list and give it to him.  I gave
16 JACK three numbered copies of the updated weapons list and I told
17 JACK that on April 24, 2007 I had shown Lo Cha THAO AK-47s, AT-4
18 rockets, a Stinger missile, and an M-14 rifle.

19      JACK looked at the weapons inventory and commented about the
20 price of the Stinger missiles.  I told him that Lo Cha THAO
21 wanted two Stinger missile trigger units and two missiles for
22 each trigger unit.  I told JACK that I did not want to accompany
23 Lo Cha THAO to Thailand due to concerns over my own safety.  I
24 told JACK that I was willing to take a calculated risk, but going
25 to Thailand with Lo Cha THAO was too risky.  JACK agreed and said
26 that things in Thailand were very tight right now.  I told JACK
27 that I had conducted business in Thailand for several years and
28 had associates I could count on.  JACK told me that he had been

1  concerned about safety and told me that "they" (Neo Hom) had lost
2  a shipment a couple of years ago that cost them eight hundred
3  thousand dollars.

4       JACK voiced his concern about the lack of planning and told
5  me that he believed a well placed "team" (referring to special
6  operations trained personnel) could secure Vientiane (the capitol
7  of Laos) in order to disrupt Laotian government operations.  I
8  told JACK that I would require payment in full prior to
9  additional orders being shipped and he asked me if we would then
10 settle up (referring to his commission).  I told JACK I would
11 settle up with him outside the view of the Neo Hom.  JACK asked
12 me if I could have the weapons flown into Laos and how much
13 weight the aircraft could handle.  I told JACK the aircraft were
14 small and could handle only about 2000 pounds per airlift.  JACK
15 asked if I preferred air dropping the weapons into Laos rather
16 than driving them and I replied that I would have no problem
17 moving the weapons within Thailand.

18      JACK told me that he had Lo Cha THAO standing by to speak
19 with me, at which point he utilized **Target Telephone #2** to call
20 Lo Cha THAO.  JACK told Lo Cha THAO that I had the proper
21 infrastructure in place to deliver the weapons to their locations
22 in Thailand.  I then spoke with Lo Cha THAO, who told me that
23 JACK had answered his questions concerning the delivery of the
24 weapons.  Lo Cha THAO told me that he was waiting for
25 intelligence from Thailand regarding the drop locations and that
26 they were also in the process of interviewing and selecting
27 prospective leaders who could mobilize people in Laos to carry
28 out their plans.  I told Lo Cha THAO that I would have people in

29

1  place prior to the arrival of the weapons to insure smooth
2  delivery.  Lo Cha THAO replied "very good" and told me he would
3  get back with me as soon as possible.  JACK took the cellular
4  telephone back and told Lo Cha THAO he would call as soon as our
5  meeting was over.  JACK and I spoke about placing mercenary
6  forces in strategic locations and we concluded the meeting.

7      JACK advised me that the group was about ready to place an
8  order.  JACK advised me that the group had reduced their search
9  for a commander-in-chief (CINC) to three candidates, and that the
10 command group had asked JACK to sit on the panel to select the
11 CINC.  JACK said that they had an agent in place in Laos
12 collecting intelligence, and that the order would be placed after
13 the agent returned.  I reminded JACK that I previously had told
14 him that I would be going to Iraq in early June, and would not be
15 available for awhile.  JACK said that he did not remember being
16 told that I was going out of town.  JACK immediately called Lo
17 Cha THAO on Jack's cell phone and spoke with LO about my
18 impending trip.  I got on to the telephone myself and spoke to
19 LO.  I reminded him of my upcoming trip.  LO said that they had
20 an agent in place in Laos collecting intelligence, and that they
21 would be placing an order with me upon the return of the agent.
22 I was led to believe that the agent would be returning to the
23 United States during the week of May 7.

24      We ended the conversations with the agreement that they
25 would contact me with an order upon the return of their agent
26 from Southeast Asia.

27      78.  On May 4, 2007 JACK telephoned me and left a message
28 asking me to call him back.  JACK also said that he had spoken

30

1   with Lo Cha THAO and it sounded as if they (I took this to mean
2   the Neo Hom) were ready to make a deposit on their first order of
3   weapons.

4        79.   I placed a return call to JACK, who told me that Lo Cha
5   THAO was leaving later that afternoon for a planning meeting with
6   some folks from England.   JACK asked me if I am aware of any
7   planning cells out of England "relative to this kind of opera-
8   tion."   I told JACK that there are special operations groups such
9   as the SAS (Special Air Service) and SBS (Special Boat Service)
10  that are similar to our special operations guys.   JACK told me
11  that Lo Cha THAO was going to meet with them and bring back any
12  recommendations that they had.   Jack also told me that, according
13  to Lo Cha THAO, the Agency (which I understood to be the CIA) was
14  standing by and ready to roll.   I understood his statement to
15  mean that the CIA was preparing to assist the Hmong insurgency
16  once the takeover of Laos had begun.

17       JACK told me that Lo Cha THAO had the right backing in
18  Thailand and he felt it would be beneficial for the three of us
19  (JACK, Lo Cha THAO and I) to go to Thailand and get a feel for
20  the facts.   JACK also said that Lo Cha THAO was ready to make a
21  deposit on the weapons order, but he wanted to place a small
22  initial order to verify ground and air delivery.

23       I told JACK that all my costs for this delivery were on the
24  front end and that I would accept a one hundred to one hundred
25  fifty thousand dollar order.   I told JACK that my partner had
26  potential buyers for some of the listed weapons, more specif-
27  ically, the Stinger missiles and asked him to let me know if they
28  (Neo Hom) were still interested in the missiles.   JACK told me

31

1  that he had not discussed that as of yet but he did say that Lo
2  Cha THAO was ready to "come to the table with cash in hand."  I
3  told JACK that I would accept ten thousand dollars as a
4  reservation for each Stinger missile as long as the first order
5  was a minimum of one hundred thousand dollars.

6      JACK asked, "Fifty thousand next week," and I told him half
7  up front with an agreement for future orders if all went well.
8  JACK and I set up a potential meeting date for May 10 or 11, 2007
9  for an exchange of money.  JACK then told me that they (Neo Hom)
10 were intending on securing Vientiane and Long Chang, which JACK
11 told me was a former CIA base.  I asked JACK if they controlled
12 Long Chang as of now and he told me "no" but stated that it would
13 be easy to take due to minimal security.  The conversation was
14 concluded.

15     80.  Later that same day, May 4, 2007, I called JACK and
16 left a message asking JACK to call me.  JACK called me back and
17 told me that he had spoken to Lo Cha THAO, who told him that he
18 would have the items (which I understood to be firearms) selected
19 and faxed to JACK by Monday, May 7, 2007.

20     I told JACK that my partner was not happy with the size of
21 the first order and JACK replied that this was the first of many
22 orders to come.  JACK said that Lo (Lo Cha THAO) was hesitant to
23 place a large order and that this first order was only to test my
24 ability to deliver the weapons.  JACK said Lo's (Lo Cha THAO)
25 people had lost orders in the past and they needed to feel secure
26 about this first order.

27     I asked JACK to get me a listing of the type of weapons
28 they wanted and the quantity of weapons as soon as he could.  I

1  told JACK it would take me a few days to assemble, inspect and
2  pack the weapons.  I told JACK that I would have the weapons
3  available for Lo Cha THAO to inspect at our next meeting and I
4  suggested that Lo Cha THAO write a note to the Hmong fighters so
5  that we could include it inside the weapons crate.  JACK thought
6  that it was good idea and said he would suggest it to Lo Cha
7  THAO.  The call was concluded.

8      81.  On May 7, 2007 Harrison JACK called Lisa (LNU) and left
9  a message for Lisa asking her to call him.  JACK said that he had
10 a gentleman by the name of "Steve" who was offering some assist-
11 ance to the Hmong community and nobody knew who he was.  JACK
12 said on the message that he wanted to do some "due diligence" and
13 asked if she would call him.  The telephone call was concluded.

14     82.  Also on May 7th, I called Harrison JACK and I told JACK
15 that I had spoken with my partner and we had ironed things out.
16 I told JACK that everything was fine and asked how his weekend
17 had gone.  JACK told me that he held a dinner party at his house.

18     JACK went on to describe the Long Chang area of Laos and
19 said that it was a tactically advantageous area that would be
20 easily defensible.  JACK suggested that it could be used as a
21 special operations base and asked for my opinion.  I told JACK
22 that it sounded like a good idea but it would require significant
23 start up money.  JACK said that he was not thinking about the
24 money right now, he was only developing concepts.

25     JACK then told me that the Hmong people were questioning
26 him regarding my identity and my ability to deliver the weapons.
27 JACK said "how do we know we are not going to get stung on this?"
28 I asked JACK if they (Neo Hom) were concerned about getting

                                 33

1  ripped off and replied "well either that or you're working for
2  the feds or you're a special agent".

3       JACK explained that the concern arose because the Hmong have
4  recently been identified as a terrorist organization.  JACK said
5  that according to Lo (Lo Cha THAO), the Hmong are being desig-
6  nated as terrorist related people according to some type of new
7  legislation and that they (Neo Hom) were getting nervous now that
8  an exchange of money was near.

9       I told JACK that I have dealt with this issue in the past
10 and that there was really no way for me to present some sort of
11 assurance other than delivering the weapons as promised.  I asked
12 JACK how he felt about our association and he said he felt good.
13 JACK explained that Lo Cha THAO was concerned not only with the
14 weapons being delivered but he was also concerned about "saving
15 face" among the Hmong community.  JACK said that Lo Cha THAO had
16 come up through the organization and that he was more of a
17 politician rather than a field combatant.

18      I told JACK that I had been bringing in weapons in prepar-
19 ation for the shipment and that Lo Cha THAO would be able to
20 inspect everything for additional reassurance.  JACK asked how
21 long it would take for delivery and I replied, "Two weeks."  JACK
22 said that the delivery time was okay and told me that he was
23 waiting to hear from Lo (Lo Cha THAO).  I told JACK I would be
24 waiting to hear from him.  The call ended.

25      83.  At approximately 10:35 a.m. on May 7th, Harrison JACK
26 called Lo Cha THAO.  JACK asked Lo Cha THAO if he was back in
27 California and Lo Cha THAO replied that he still was in St. Paul
28 (Minnesota).  JACK told Lo Cha THAO that he had just spoken with

34

1  me and that I need to have a list identifying what items
2  (weapons) they want.  Lo Cha THAO told JACK that he did not have
3  the "master list" put together yet and asked if it could wait
4  until Thursday (May 10, 2007).

5      JACK told Lo Cha THAO that I needed the list in order to put
6  the equipment (weapons) together.  JACK asked Lo Cha THAO if
7  there was anyone he can call to put the list together and Lo Cha
8  THAO replied that there is not.  Lo Cha THAO told JACK that he
9  could fax the list to him by late afternoon on May 8, 2007.  JACK
10 told Lo Cha THAO that he would leave it up to him, but he asked
11 Lo Cha THAO to have someone set up to help facilitate the
12 production of the list.  Lo Cha THAO replied that he would have
13 it by noon on May 8, 2007.  The call ended.

14     84.  At approximately 10:41 a.m. on May 7th, Harrison JACK
15 telephoned me from and left me a message that he had spoken with
16 Lo (Lo Cha THAO) and that he was still in Minneapolis.  JACK said
17 that he would fax a copy of the order to me by noon on May 8,
18 2007.  JACK said that he told Lo Cha THAO that the commitment was
19 today and that it was unacceptable, but that was the way they
20 (Neo Hom) do business.  JACK said there was a group of three or
21 four people who were finalizing everything.  The call ended.

22     85.  At 11:48 a.m. on May 7th, I telephoned Harrison JACK
23 asked JACK if he was around the week of May 14.  Jack replied
24 that he would be in Mexico.  JACK explained that his wife was a
25 travel agent and she was receiving some type of recognition.  I
26 asked JACK if he wanted to change the meeting to Friday, May 11.
27 He initially wanted to keep the meeting set for Thursday.  I told
28 JACK I needed a few days to put the equipment (weapons), together

35

1  and he agreed to move the meeting to Friday, May 11, 2007 at 2:00
2  p.m.

3      86.   At approximately 1:50 p.m. on May 7th, Lo Cha THAO
4  called Harrison JACK and left a message that he would be
5  returning during the evening hours. Lo Cha THAO told JACK that
6  he had numbers (referring to weapons) and asked JACK to call him
7  so the information could be relayed to me.

8      87.   At 3:53 p.m. that day, Harrison JACK called Lo Cha
9  THAO and asked Lo if he was in a position to give the numbers.
10 Lo replied that he wanted JACK to calculate one hundred thousand
11 for all the "ammos" (referring to ammunition) and the AK-47s.
12 JACK agreed and suggested that they also include some
13 "pyrotechnic" (referring to hand held smoke grenades). Lo Cha
14 THAO told JACK that those items will come in the second order
15 because the first order is going to be by ground. Lo Cha THAO
16 told JACK that they will not need "pyrotechnic" because the order
17 is not going to be by air. JACK told Lo Cha THAO that the people
18 on the ground will need them (smoke grenades) in hand prior to
19 the second shipment in order to mark drop locations and landing
20 zones.  Lo Cha THAO agreed with JACK, who told Lo Cha THAO that
21 they will only need about a dozen smoke grenades.  JACK told Lo
22 Cha THAO to "trust me on this one."  JACK told Lo Cha THAO to
23 have a safe return trip and the call ended.

24     88.   At 4:00 p.m. on May 7th, Harrison JACK called me and
25 left me a message indicating that he had just gotten off the
26 phone with Lo (Lo Cha THAO) and that he (Lo) wanted everything
27 into item number 6, alpha kilos (referring to AK-47 rifles that
28 were item #6 on the list). JACK also said that he had encouraged

36

1 Lo Cha THAO to include some smoke and said that he would talk
2 with me later regarding the smoke.   The message ended.

3       89.   On May 8, 2007, Harrison JACK telephoned me and left a
4 message saying that he may need ten to twenty smokes (smoke
5 grenades) for ten different locations.   JACK also said that he
6 would need instructions on how to use the smoke grenades because
7 Lo Cha THAO did not know how to use them but it was possible the
8 "boys in the field" would know how to use them.   JACK said we
9 could discuss it at a later time.   The message ended.

10      90.   At approximately 10:06 a.m., May 8, 2007, Harrison JACK
11 telephoned Lo Cha THAO.   JACK left a message for Lo Cha THAO
12 advising him that everything had been passed to me.   JACK said
13 the meeting would probably take place on Friday (May 11, 2007)
14 depending on my resources and he said he would try to call again
15 later.   The message ended.

16      91.   At 5:45 p.m., Harrison JACK called Lisa (last name
17 unknown).   JACK left a message for Lisa telling her that he has
18 an individual by the name of "Steve" who might be an undercover
19 FBI agent.   JACK asked Lisa to run "Steve's" name and number
20 through the checks she has.   JACK tells Lisa that he will be in
21 touch.   The message ended.

22      92.   On May 9, 2007 at 10:31 a.m., Harrison JACK telephoned
23 Lo Cha THAO and told Lo Cha THAO that I want to close the deal on
24 Friday, May 11, at around two or three o'clock.   JACK told Lo Cha
25 THAO that he felt pretty good about the deal, but he had had a
26 conversation with the person who referred me to JACK [the defense
27 contractor who contacted ATF-Phoenix in November of 2006].   JACK
28 told Lo Cha THAO that this person spoke with him as if he did not

37

1 | expect to hear from him again, and that has JACK a little
2 | concerned.

3 |    93.   JACK suggested to Lo Cha THAO that the money exchange
4 | be conducted in a place that is open and visible.  JACK told Lo
5 | Cha THAO to place the money inside this place and insert someone
6 | who may recognize me as I pick up the money.  JACK told Lo Cha
7 | THAO this may be the way to handle the money exchange, so that if
8 | it is a sting operation, none of the leadership will be there.
9 | JACK told Lo Cha THAO about an email he read about some individ-
10 | uals who were trying to buy AK-47s in Fort Monmouth, New Jersey.
11 | JACK said that the guys buying the guns got burned by an agent
12 | who had been working with them for a couple of months.  Lo Cha
13 | THAO told JACK that he will talk with his committee and get back
14 | to JACK later in the day.  The call ended.

15 |    94.   On the same day at 11:19 a.m., I called Harrison JACK
16 | and left a message that I had secured the smokes (smoke grenades)
17 | and asked him to call me back.  I dialed the number a second time
18 | and JACK answered.  JACK told me he was waiting to hear from Lo
19 | Cha THAO and he probably would not get a call until three
20 | o'clock.  I told JACK that I had several cases of smokes (smoke
21 | grenades) and that I would include them in the shipment.  JACK
22 | said that he wanted to include the smoke grenades so that the
23 | forces on the ground could identify themselves for air drops.

24 |    95.   I told JACK that the equipment (firearms) was in and
25 | that I was preparing it for shipment.  JACK asked me if they were
26 | all Polish and I told him they were a mixture.  I also told him
27 | that I had some folding stock versions, referred to as Krinkovs,
28 | for them to look at.  I also told JACK that I had 20,000 rounds

38

1 of 7.62x39mm ammunition.  JACK told me that he would get back
2 with me after he spoke with Lo Cha THAO.  The call ended.

3     95.  At 12:44 p.m.,  Harrison JACK received a telephone call
4 from Lo Cha THAO.  JACK told Lo Cha THAO that he had no way of
5 checking my credentials and that there was a possibility of my
6 being an FBI agent.  JACK suggested to Lo Cha THAO that he set
7 the location for the next meeting as a precaution.  JACK
8 suggested that the location be a Hmong grocery store or some
9 place similar.  JACK told Lo Cha THAO that all the leadership
10 would have to stay away from the location and once I arrived, he
11 would get my license plate and place a tracker on my vehicle.

12     96.  JACK told Lo Cha THAO that the person who placed me in
13 touch with him has marginal credibility and had a background as a
14 law enforcement officer.  Lo Cha THAO told JACK that during his
15 meeting with the person from England, a personal friend of Lo's
16 was there.

17     Lo Cha THAO told JACK that they told him not to do the deal
18 in the United States.  Lo Cha THAO told JACK that his friend
19 questioned his relationship with JACK and asked him if there was
20 a high level of trust between himself and JACK.  Lo Cha THAO said
21 that he trusted JACK.  His friend told him not to trust anyone
22 else.

23     97.  Lo Cha THAO said his friend told him that he knew about
24 these sting operations and that they will make you feel comfort-
25 able but in the end they will get you.  The friend told him (Lo
26 Cha THAO) that funds could not be exchanged inside the United
27 States.  The friend suggested going to Mexico or taking a boat
28 into international waters to avoid exchanging money inside the

1  U.S.

2       98.    The friend told him that if I was not willing to accept
3  money outside the U.S. that I was probably planning something.
4  Lo Cha THAO said that he told his friend about the meetings that
5  occurred in the hotel and his friend asked him if everything was
6  set up prior to his arrival.

7       99.    When Lo Cha THAO told him that everything had been
8  arranged prior to his arrival his friend told him that it may
9  have been set up and recorded.  Lo Cha THAO told JACK that during
10 one of the hotel meetings he saw a badge on my partner and that
11 it was on my partner's shirt.  Lo Cha THAO then said that he also
12 saw a black wire on my partner, but he didn't discuss it with
13 anybody because he did not want to lose credibility.

14      JACK and Lo Cha THAO discussed a way to test my ability and
15 trustworthiness, and agreed to ask me to accept payment overseas.
16 Lo Cha THAO told JACK that if I agreed to accept payment
17 overseas, there is no law that can be used against them.  Lo Cha
18 THAO said that his friend told him that five years ago the FBI
19 used their own agents to sting the top FBI agent and that he (Lo
20 Cha THAO) is nothing more than the FBI guy.  JACK agreed to call
21 me and propose an overseas money exchange to occur inside
22 Thailand.    JACK asked Lo Cha THAO if Lo's friend had made any
23 comment about laws that they had broken up until now.  Lo Cha
24 THAO said that according to his friend, as long as no money
25 exchange has occurred, no laws had been broken.  JACK replied,
26 "Ok, good."  Lo Cha THAO told JACK to call him later and the call
27 ended.

28 ///

40

1     100.   Subsequent investigation has identified the person to
2  whom Lo referred as his friend.

3     101.   At 5:05 p.m. on May 9, 2007, I telephoned Harrison
4  JACK.   JACK told me that he spoke with Lo Cha THAO, and Lo had
5  received guidance over the weekend concerning the money trans-
6  action.   JACK told me that Lo Cha THAO wanted to complete the
7  shipment payment in Mexico, Thailand or offshore in international
8  waters.   I told JACK that I had done some checking and was con-
9  cerned about some of the members of Lo Cha THAO's organization,
10  specifically Hue VANG.   I told JACK that I had found out that Hue
11  VANG was a former police officer and JACK replied that several of
12  the Hmong in the group are law enforcement officers, some from
13  the Riverside County Sheriff's Department and California Highway
14  Patrol.

15     JACK told me that he does not believe there is anything to
16  be concerned with.   JACK and I spoke about recent news events
17  highlighting an arrest of several individuals planning a
18  terrorist-style raid on Fort Dix.   I told JACK that I was a
19  little concerned with my own safety since I did not know most of
20  the members of Lo Cha THAO's group.   JACK and I agreed to cancel
21  our meeting for Friday, May 11, in light of increased law
22  enforcement activity.

23     I told JACK that I would accept payment outside of the U.S.
24  and that Thailand would be a good location.   I told JACK that I
25  have all the weapons in place and could deliver them on May 28,
26  2007.   JACK replied that May 28 is not a good date because Lo Cha
27  THAO will be in Washington D.C. during that time.
28  ///

41

1      I told JACK that I had 125 AK-47 rifles, 20,000 round of
2  ammunition, four cases of smoke grenades, six 30 round magazines
3  per firearm and cleaning kits.  JACK asks about "web" gear
4  (referring to nylon utility belts) and I told him that they (Neo
5  Hom) had never asked for web gear and I do not have any that is
6  ready.

7      I asked about what may be ordered for the second shipment
8  and JACK stated that he believed it would be a continuation of
9  the first order.  He said they may order something for anti-
10  aircraft but he was not sure.  I asked him if I needed to be
11  worried about receiving full payment for the shipment and he
12  replied that he did not believe money would be an issue.

13     102.  At 5:25 p.m. Harrison JACK telephoned Lo Cha THAO and
14  told Lo that he had spoken with me and that I was willing to meet
15  where ever he wanted.  JACK told Lo Cha THAO that he felt com-
16  fortable with the situation.  Lo Cha THAO replied, "Ok, we"ll
17  give it to you and then you give it to him."  Lo Cha THAO then
18  told JACK that he should get a brokers fee and JACK replies that
19  he is not in it for that (referring to a fee).

20     JACK told Lo Cha THAO that I can have the first shipment in
21  Thailand on May 29, 2007.  Lo Cha THAO replied that he will be in
22  Washington D.C.  JACK said that Lo Cha THAO will have to come up
23  with a delivery date.  Lo Cha THAO then asked JACK if I told him
24  what is being delivered, and JACK replied that it is one hundred
25  and ten items (referring to firearms), twenty thousand rounds,
26  four cases of smoke, red, green and a concentrate and ten
27  cleaning kits including oil, patches and everything to maintain
28  them.

1    JACK told Lo Cha THAO that I have connections inside
2  Thailand, and that I have access inside the country.  Lo Cha THAO
3  told JACK that we will get together.  JACK told Lo Cha THAO that I
4  am very concerned with security, and that I mentioned it even
5  before he did.  Lo Cha THAO asked JACK if everything is good, and
6  JACK replied that it was.  Lo Cha THAO told JACK that we will
7  finalize everything on Friday.  The call ended.

8    103.  At 5:34 p.m. Harrison JACK telephoned me and told me
9  he had just gotten off the phone with Lo Cha THAO and that
10 everything went well.  I asked JACK if he told Lo Cha THAO about
11 the substitution of 10 Krinkov-style rifles and he replied that
12 he did not.  I told JACK that the total count for the rifles was
13 one hundred and twenty five, as we had agreed.

14    JACK said that he would have destination details by Friday
15 at around two o'clock.  JACK asked me if I would accept payment
16 inside Thailand.  He further explained that we could meet to
17 confirm delivery and make plans for a second shipment.  JACK
18 asked me if I had a preferred currency and I told him I preferred
19 U.S. dollars as opposed to Thai baht.  JACK told me he wanted to
20 call Lo Cha THAO back and he would call me on Friday with
21 additional information.  The call ended.

22    104.  At 5:41 p.m., Harrison JACK telephoned Lo Cha THAO and
23 told Lo that I am going to replace 10 of the rifles with 10
24 Krinkovs.  JACK explained to Lo Cha THAO that a Krinkov is a
25 shortened AK-47-style rifle with a folding stock, and is conven-
26 ient and compact.  Lo Cha THAO asked if it is an additional cost
27 and JACK replied that it wasn't.  JACK told Lo Cha THAO that I
28 needed his arrival date so I can coordinate delivery and Lo Cha

43

1 THAO told JACK that he will provide it.  JACK told Lo Cha THAO
2 that he would call me on Friday, May 11, 2007, with all the
3 critical information, and Lo Cha THAO agreed.  The call ended.

4      105.  On May 10, 2007, Harrison JACK telephoned me and said
5 that he had recently spoken with Lo Cha THAO and Lo told him that
6 he lost his brother who was a major commander.  Lo Cha THAO told
7 JACK that because of this they are going to move operational
8 planning and support to Thailand.  JACK asked me if all weapons
9 transactions and funding could be done overseas and I told JACK
10 that it was fine.

11      JACK said that he believed that future weapons orders would
12 be requested and paid for by people on the ground.  JACK asked Lo
13 Cha THAO if upon delivery of the first shipment there would be a
14 second payment to complete the first shipment and immediate
15 payment for the next order.  According to JACK, Lo Cha THAO told
16 him that they (Neo Hom) have a minimum of "150" in hand right now
17 for the first order.

18      JACK told me that Lo Cha THAO believes the Thai forces are
19 aware of Hmong efforts to organize, and JACK feels that things
20 will move very quickly.  JACK told me that they (Neo Hom) are
21 moving money and the have their own network for getting in and
22 out (of Laos).  JACK told me that I represent their best resource
23 for this initiative that they've been trying to get started for
24 35 years.  JACK told me he and Lo Cha THAO had a meeting
25 scheduled for Friday, May 11, and he will contact me soon with
26 the proposed dates for shipment arrival.  The call ended.

27      106.  At approximately 2:40 p.m. on May 10th, JACK called me
28 and provided the dates of June 9 and June 11 as the days we could

44

1  meet in Thailand for weapons delivery.  I asked JACK to confirm
2  the delivery location and to have someone present with whom I
3  would be familiar.  JACK asked how he could contact me in
4  Thailand.  I told him my cellular phone works while in country.
5  JACK told me he would update Lo Cha THAO and call me later.  The
6  call ended.

7  107.  At 3:32 p.m. on May 10th, Harrison JACK received a
8  telephone call from Lo Cha THAO.  JACK told Lo Cha THAO that I
9  was willing to make all arrangements and accept payment in
10  Thailand.  JACK indicates that this is a good thing and that he
11  felt comfortable with me and my credibility.  JACK provided the
12  dates of June 11 for the arrival of the shipment with June 12 as
13  the delivery date.  JACK also told Lo Cha THAO that I would like
14  half payment on June 9, in Thailand, with the final payment upon
15  delivery.  Lo Cha THAO told JACK that he has no problem with the
16  dates and payment arrangements.

17  JACK asked for confirmation of the delivery location and Lo
18  Cha THAO told him that he will have it before the meeting sched-
19  uled for Friday, May 11, 2007.  JACK told Lo Cha THAO that I have
20  been checking them out (referring to security checks) and that I
21  trust them.  Lo Cha THAO responded by saying that they are
22  freedom fighters and I do not have to worry about them.  JACK and
23  Lo Cha THAO agreed to meet with President THAO (co-conspirator Lo
24  Thao) at his residence and the call ended.

25  108.  At 3:52 p.m. on May 10th, Lo Cha THAO called Harrison
26  JACK and asked JACK to set up a meeting between himself, JACK and
27  me for the purpose of discussing special operations mercenaries
28  for the upcoming operation.  Lo Cha THAO told JACK that the

1  committee wants to know about the men, and told him that the men
2  will be needed two weeks after the delivery of the equipment
3  (firearms).  JACK told Lo Cha THAO that he will try to set up a
4  meeting for 3:00 p.m. on Friday, May 11, 2007 after their meeting
5  with President THAO.  The call ended.

6  109.  At 3:56 p.m., on that same day, Harrison JACK called
7  me and told me that Lo Cha THAO wanted a meeting on Friday at
8  3:00 p.m. to discuss mercenaries for insertion into operations
9  approximately two weeks after the equipment (firearms) arrives
10  "in country."  I agreed to a meeting at a particular Bar and
11  Grill in Sacramento, California.  I told JACK that I would
12  require funding in advance of contacting my people.  JACK told me
13  that Lo Cha THAO felt comfortable with the planning and he
14  expects to be in Thailand at the time of delivery.

15  110.  On May 11, 2007, Harrison JACK telephoned Rick CARDIN
16  (408-569-3346) and told CARDIN that he has some military
17  equipment to be delivered and made available in Thailand and
18  asked CARDIN if he has the resources in place to be able to
19  accomplish the delivery.  CARDIN replied that he does not and
20  asks JACK what kind of equipment it is.  JACK told him that it is
21  private.  CARDIN replied that they shouldn't be talking over the
22  cellular phone, and that they should meet.  JACK told CARDIN that
23  the early part of June would be good and they agree to meet then.
24  The call ended.

25  111.  Later on May 11th, at approximately 4:04 p.m., I met
26  with Harrison JACK and Lo Cha THAO at the specified Bar and Grill
27  in Sacramento.  Lo Cha THAO told me that JACK had provided him
28  with my proposed delivery dates.  Lo Cha THAO said they (Neo Hom)

46

1  were trying very hard to make sure everything was in place to
2  facilitate delivery as I had instructed.  Lo Cha THAO told me
3  that they (Neo Hom) were sending nine or ten people overseas with
4  "ten each" (I took this to mean $10,000 each) in order to avoid
5  being questioned.  I told Lo Cha THAO that I would call him and
6  suggested we meet in Bangkok prior to the weapons being
7  delivered.

8      I asked Lo Cha THAO if the second order was to be delivered
9  by land or air and he replied that it would depend on how well
10  their mobilization was going.  JACK asked THAO if they (Hmong
11  insurgents) were at rallying points right now, and Lo Cha THAO
12  replied, "Yes."  JACK also told me that he had spoken to one of
13  their (Neo Hom) strategic planners and was told they (Neo Hom)
14  had five thousand men in place.  Lo Cha THAO told me that he
15  wanted my men to do a "quick set up" in Vientiane and said that
16  any disaster would send the Laotian government out of the
17  country.

18      JACK asked Lo Cha THAO if his plan was to create diversion
19  and just "slide in."  Lo Cha THAO replied, "Yes," and also said
20  that their (Neo Hom) coup leader would present the new democracy
21  plan.  Lo Cha THAO said that they have everything but the "equip-
22  ment" ( Lo Cha THAO has referred to the weapons as equipment) on
23  the ground and that 80% of the people are in support of the
24  democracy.

25      Lo Cha THAO told me that he wanted seven or eight key
26  government buildings blown up at the same time.  I asked him how
27  much damage he wanted done to the buildings, and he replied "like
28  September 11th" (referring to the destruction of the World Trade

47

1 Center on September 11, 2001). I told Lo Cha THAO that it was
2 going to take a lot of explosives and asked him if he wanted the
3 buildings to be emptied so they would be usable at a later date.
4 Lo replied that his people have been trying to overthrow the
5 communist government for thirty five years and they need the
6 buildings to be brought down.

7 JACK also asked Lo if the buildings should not be left
8 standing so that they could be repaired and rebuilt after they
9 take over. Lo Cha Thao responded, "No." Lo said that if the
10 buildings were destroyed, the people would realize that the
11 communists no longer were in control. Lo said that if there was
12 destruction of the important government buildings, then the
13 ruling class of Laos all would get on an airplane and fly out to
14 Viet Nam.

15 Lo Cha THAO thanked me for agreeing to handle payment in
16 Thailand and told me that there were 120,000 Montagnards
17 (indigenous mountain tribe people of Southeast Asia) in the
18 Golden Triangle who also wanted equipment (weapons). Lo Cha THAO
19 explained that once they saw the first shipment arrive, I would
20 have their trust. Lo Cha THAO told me that he would need AK-47s,
21 LAWs rockets (Light Anti-Tank Weapons), AT-4 rockets and Claymore
22 mines. Lo Cha THAO agreed to act as a mediator with the
23 Montagnards and the meeting was concluded.

24 112. Harrison Jack was in Mexico from May 12th through May
25 18th, and his cellular telephone was not monitored while he was
26 out of the country. There was no activity intercepted on his
27 home phone during this period.

28 113. On May 17th, agents intercepted a call between Lo Cha

48

1 Thao and his personal friend to whom Lo had referred in his phone
2 call with JACK a week earlier.  Lo's friend asked Lo if Lo had
3 followed up on his advice from their meeting the week before.
4 The friend asked Lo Cha Thao if Lo had handled it as he had
5 suggested.  Lo said that, "yes," he had.  Lo said that he "sat
6 down with them and the whole exchange was going to take place in
7 Thailand."  The friend responded, "That's a smart decision.  Then
8 there is no chance for a problem."

9     114.  On May 21st, Lo Cha Thao called Harrison Jack at
10 Jack's home.  Jack and Lo engaged in a lengthy discussion of
11 operational options and tactics on the ground in Laos.  Lo passed
12 along a large amount of intelligence that one of the conspir-
13 ators' operatives has been collecting in Vientiane.

14     They discussed a location currently being "scouted/
15 watched" (apparently the Lao Royal Palace).  They discussed
16 fortifications and security; drawing a parallel to the White
17 House.  One cannot gain access unless they're a high dignitary or
18 on some official government business. JACK stated that he guessed
19 they've really tightened security, and ponders whether word has
20 leaked out.  THAO says he does not think so and that they know
21 one day it will come.

22     JACK asked if there are pictures of the place.  THAO says
23 no, can't even get satellite or aerial pictures, it's all
24 blocked.  JACK asked if the place includes the living quarters,
25 to which THAO replied it's where all the Cabinet meets.  JACK
26 asked THAO if he has access to any senior leadership that can
27 provide "influence."  THAO said no; they're not trustworthy and
28 can go "either way."  THAO then talked about "LPDR" buildings and

49

1  federal buildings all being secured. JACK then asked about
2  banking institutions. THAO says these are all within the same
3  area.

4     THAO told JACK he's got a man on the ground that's walking
5  around like a tourist with his digital camera; trying to get
6  whatever pictures he can. They discussed recommendations for
7  gaining access and how certain ways are impossible. JACK then
8  inquired about any "soft spots" around the perimeter of the wall
9  or fence; meaning any areas which are less guarded or more
10 vulnerable.  JACK said he's just trying to get a feel for what's
11 friendly and what's not friendly, and what opportunities there
12 are.

13    JACK asked if THAO will have people continuously in place.
14 THAO said yes, and that he's got everything mobilized. JACK said
15 if the undercover agent has questions about specifics, how long
16 would it take for THAO to coordinate Intel from the ground? THAO
17 said he can realistically get Intel from the ground within 48
18 hours.  THAO said that he'll provide JACK with that info.  JACK
19 said there's some more detail that'll be needed.

20    JACK asked about the most vulnerable point in Vientiane, and
21 THAO stated that it's the Capital. THAO talked again about his
22 person on the ground and how far away it is (presumable the
23 Capitol building)( THAO doesn't come out say it directly).

24

25    115.  I attended a meeting with Harrison Jack, Lo Cha Thao,
26 Lo Thao and Chong Yang Thao at the specified bar and grill in
27 Sacramento on the evening of Wednesday, May 23rd.  Harrison Jack
28 arrived first, and then the other three arrived together.

50

1    I showed the group several satellite images downloaded from
2  Google of the area around the Vientiane Vattay International
3  airport and the Laos Royal Palace in Vientiane, Laos.

4    Lo Cha Thao pointed to some buildings in the vicinity of the
5  Palace and suggested that these interlocking building were where
6  the Laos govenment all had their meetings.

7    Lo pulled out a map of Thailand and Laos and identified
8  several locations near the Thailand-Laos border where I could
9  deliver weapons.  Lo showed me two locations on the map and said
10  he wanted the first shipment divided and delivered to those
11  locations.  I told Lo there was an increased risk involved in
12  splitting up the first load and said that I would deliver the
13  weapons shipment that way if he wished.  I told Lo that I could
14  deliver the second load of weapons and equipment 7 days after the
15  first load.

16    Harrison Jack suggested Lo choose three or four delivery
17  locations where shipments could be continuously received.  Lo
18  said that even if he pinpoints the delivery locations, I would
19  have difficulty finding the locations.  I suggested that Lo
20  purchase GPS units to mark the delivery locations.

21    Lo said that there were a lot of groups "on the move."
22  Harrison Jack asked Lo how many groups, and he answered, "a lot."
23  Harrison Jack advised that all groups should be outfitted with a
24  GPS mechanism so that all groups know where all the other groups
25  are at any given time.  Jack said that it was important that all
26  groups be on the same frequency so they can communicate.  One
27  group may get stopped in their advance, and it may be necessary
28  to divert troops as a result.

51

1     I gave Lo a list of questions for the intelligence officer
2   and tasks that would have to be accomplished in Vientiane in
3   order to accommodate the insertion of the 24 mercenary troops
4   that Lo wanted.  I also advised the group that the answers had to
5   be in English when I got them.  I advised the group that it would
6   be necessary for their assets on the ground to have vehicles
7   available to transport 24 of my mercenary special operations
8   troops from the landing zones to the Area of Operations (AO) in
9   downtown Vientiane.  I pointed out to Lo and the others that they
10   had to have their own troops in place to delay a reactionary
11   force from getting to the palace while my mercenaries were in the
12   palace. Lo also had to have his assets securing the roads to the
13   landing zone so my mercenary special operations troops could
14   extract after the job was finished.

15     Lo asked if the mercenaries were going to look like
16   "ordinary tourists," and for what reason was it necessary for him
17   to have his own troops engaged.  I advised him that Lo's troops
18   had to clear the landing zones for the mercenary troops to land,
19   and to transport the mercenaries from the LZ's to the AO and
20   return.    It was decided among the group that the team would be
21   inserted prior to 0500, hit the government buildings in the AO in
22   downtown Vientiane at 0500 and be out of the AO by 0530 to fly
23   out of the country back to Thailand.

24     Lo told me that the Stingers would be in the second load and
25   asked me if the Stingers were capable of shooting down a MiG.  I
26   told Lo that the Stinger was made to shoot down jet aircraft.  Lo
27   pointed out that the Stinger missiles were in their second order,
28   which was to arrive 7 days after the first load of 125 AK-47

1   automatic rifles, ammunition and smoke grenades.

2       Harrison Jack pointed out to Lo that when the government
3   buildings came down, Lo had to have troops in place outside the
4   buildings ready to take over and "do what they need to do.  That
5   is how you cut the head off the snake."  In the context of the
6   conversation, it was clear that Harrison Jack was talking about
7   assassinating the government officials who might be in the
8   buildings at the time of attack.

9       There was a lot of discussion about the day upon which Jack,
10   Lo Cha Thao, Lo Thao and the rest of the party would have to
11   leave California to travel to Bangkok.  There was talk about
12   leaving no later than June 6th, so that they would be in Bangkok
13   no later than June 8th.  There was discussion about the first
14   load of arms and munitions being delivered on June 12th, and
15   therefore the second load, which would include the Stinger
16   missiles, would be delivered on June 19th.  Lo indicated that it
17   would take three or four loads to handle their needs for arms and
18   munitions.  Lo also pointed out that it would be the rainy season
19   in Vientiane, so his troops needed rain gear, and wondered if I
20   was able to supply the rain gear.  I advised Lo that I needed the
21   sizes for the rain gear, and needed to have Lo give me the second
22   order before I left for Bangkok, because I would have to make all
23   the arrangement here for the second load before I went to Bangkok
24   on June 7th.

25       Lo pointed out that he was leaving California the following
26   day, on May 24th, to go to Washington, DC for the "Rolling
27   Thunder" event over Memorial Day weekend.  Lo said that all of
28   the leadership of the Hmong community in the United States, i.e.,

53

1  all the clan leaders, were getting together the following day in
2  Washington, DC.  There was a plan to have a large "sit-down"
3  demonstration at the Laotian Embassy in Washington on Memorial
4  Day.

5      During the two hour meeting, Lo Cha Thao, Lo Thao and Chong
6  Yang Thao engaged in several conversations in a foreign language,
7  most likely Hmong.  Following the discussions in Hmong, generally
8  Lo Cha Thao would summarize the side conversation in English.  At
9  one point, Lo Cha Thao indicated that President Lo Thao wanted to
10  bring something to my attention.  He then explained about a
11  situation in which a number of Hmong young girls, between the
12  ages of 11 and 14, were being exploited by the communist govern-
13  ment, and were in danger of being killed.  There also was some
14  discussion at this point about the need for medical equipment and
15  night vision goggles.

16      Towards the end of the meeting, I asked Lo Cha Thao if
17  General Vang Pao was all right with all of this, and whether he
18  agreed.  Lo said that Yes, meaning/indicating that General Vang
19  Pao was fully engaged in the discussion and was on board.  Lo
20  said, "We're the masterminds on this so the Generals don't get
21  into trouble."  Lo said that General Vang Pao wants to walk into
22  Vientiane before he dies.  Lo Cha Thao finished the conversation
23  by joking that, "COL Jack is going to be my Prime Minister

## CONCLUSIONS

25      For the foregoing reasons, there is probable cause to
26  believe that the named defendants have committed the listed
27  ///
28  ///

54

1  offenses, and I ask that a criminal complaint and arrest warrants

2  be issued for each defendants.

3  DATED: June 3, 2007

4

5  **REDACTED**

                             Special Agent

6                     Bureau of Alcohol, Tobacco, Firearms
                     and Explosives

7

8     Subscribe and sworn to before me on this 3 day of June,

9  2007 at Placerville, California.

10                                                                                           GREGORY G. HOLLOWS

11                      United States Magistrate Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28